# COMMISSIONER OF INTERNAL REVENUE *v.* LINCOLN SAVINGS & LOAN ASSN.

No. 544. Argued February 23, 1971—
Decided June 14, 1971

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, BRENNAN, STEWART, WHITE, and MARSHALL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post,* p. 359.

*Matthew J. Zinn* argued the cause for petitioner. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Walters, Thomas L. Stapleton,* and *David English Carmack.*

*Adam Y. Bennion* argued the cause for respondent. With him on the brief were *A. Calder Mackay* and *Victor L. Walch.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether the "additional premium" paid in 1963 by a state-chartered savings and loan association to the Federal Savings and Loan Insurance Corporation under the compulsion of § 404 (d) of the National Housing Act, as amended, 12 U. S. C.

§ 1727 (d),[1] is deductible by the association, for income tax purposes, as an ordinary and necessary business expense under § 162 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 162 (a).

The Commissioner of Internal Revenue determined a deficiency of $461,454.38 in the 1963 cash basis federal income tax of Lincoln Savings and Loan Association. Nearly all the deficiency was attributable to the disallowance of a deduction claimed for Lincoln's payment of $882,636.86 made pursuant to § 404 (d). Lincoln sought redetermination in the Tax Court. Judge Raum, in a decision reviewed by the court without dissent, upheld the deficiency. 51 T. C. 82 (1968). On appeal the Ninth Circuit reversed, one judge dissenting. 422 F. 2d 90 (1970).[2] Because of the importance of the issue for

---

[1] Section 404 (d), as amended by the Act of Sept. 8, 1961, § 6, 75 Stat. 483, read:

"(d) Each insured institution, except as otherwise provided in this section, shall annually pay to the Corporation, at such time and in such manner as the Corporation shall by regulations or otherwise prescribe, an additional premium in the nature of a prepayment with respect to future premiums of such institution under subsection (b) equal to 2 per centum of the net increase in all accounts of its insured members during the next preceding calendar year, less an amount equal to any requirement, as of the end of such calendar year, for the purchase of stock of the Federal Home Loan Bank of which such institution is a member, calculated in accordance with the provisions of subsection (c) of section 6 of the Federal Home Loan Bank Act and without regard to any net increase during such calendar year in its holdings of such stock, and such prepayments shall be credited to the Secondary Reserve . . . ."

The foregoing is the form of the statute in effect during 1963. Subsection (d) was further amended by the Act of Sept. 21, 1968, § 6 (a), 82 Stat. 858, and by the Act of Dec. 24, 1969, § 416 (c) (1), 83 Stat. 401, in ways of no significance here.

[2] Accord, as to federal savings and loan associations: *Washington Fed. S. & L. Assn.* v. *United States,* 304 F. Supp. 1072 (SD Fla. 1969), appeal pending in the United States Court of Appeals for the Fifth Circuit; *First Fed. S. & L. Assn.* v. *United States,* 288 F. Supp. 477 (WD Mo. 1968).

the savings and loan industry and for the Government, we granted certiorari. 400 U. S. 901 (1970).

## I

The pertinent facts are not in dispute. Lincoln is a California savings and loan association organized in 1925 and is licensed under state law. It is subject to Division 2 of the California Financial Code, § 5000 *et seq.*, and is also subject to the regulations of the State's Savings and Loan Commissioner. California Administrative Code, Tit. 10, c. 2.

In 1936 Lincoln applied for membership in the Federal Home Loan Bank of San Francisco (then of Los Angeles). That application was granted and Lincoln has remained a member of the Bank since that time. The San Francisco Bank is one of 12 regional ones established and supervised by the Federal Home Loan Bank Board under the Federal Home Loan Bank Act of 1932, 47 Stat. 725, as amended, 12 U. S. C. §§ 1421–1449. These banks provide liquidity and funds for mortgage lending by making advances to member institutions as needed to meet unusual or heavy withdrawal and credit demands. Each member must purchase capital stock in its bank in an amount equal to 1% of its outstanding "aggregate unpaid loan principal" and maintain that percentage. 12 U. S. C. § 1426 (c).

In June 1938 Lincoln became, and still is, an institution insured by the Federal Savings and Loan Insurance Corporation (FSLIC), a corporation created by § 402 of the National Housing Act, 48 Stat. 1256, 12 U. S. C. § 1725, and under the direction of the Federal Home Loan Bank Board. By statute FSLIC has the duty to insure the accounts of all federal savings and loan associations; it also may insure the accounts of qualified state-chartered associations such as Lincoln. Section 403 (a), 12 U. S. C. § 1726 (a).

Each institution so insured was originally required, by § 404 (a) of the Act, 48 Stat. 1258, to pay FSLIC an annual insurance premium measured by the total amount of its accounts plus creditor obligations.[3] The statute provided that these premiums were to continue annually until FSLIC's reserve for losses amounted to 5% of the insured accounts plus creditor obligations of all its insured institutions, and at such intervals thereafter as were necessary to maintain the reserve at that level.

This pattern was changed, however, effective January 1, 1962, by the Act of September 8, 1961, 75 Stat. 482. That Act, by its § 3, amended § 404 (a), 12 U. S. C. § 1727 (a), to its present form.[4]

Section 404 (a) now requires FSLIC to establish two reserves, namely, a Primary Reserve "which shall be the general reserve," and a Secondary Reserve. The requirement for the annual premium of $\frac{1}{12}$ of 1% is continued, but the level of the general reserve was lowered from 5% to 2% of the total of accounts plus creditor obligations. Sections 404 (b)(1) and 404 (b)(2), 12 U. S. C. §§ 1727 (b)(1) and 1727 (b)(2). The 1961 Act, moreover, added subsection (d) to § 404. 12 U. S. C. § 1727 (d). This required that the insured institution pay FSLIC, with respect to any calendar year, an "additional premium in the nature of a prepayment with respect to future premiums of such institution under subsection (b) . . . ." This "additional premium" was, and

---

[3] For more than a decade before 1963 the annual premium was at the rate of $\frac{1}{12}$ of 1% of that total, 64 Stat. 259; prior thereto the premium had been, successively, $\frac{1}{4}$ and $\frac{1}{8}$ of 1%. 48 Stat. 1258; 49 Stat. 298.

[4] Section 404.

"(a) The Corporation shall establish a Primary Reserve which shall be the general reserve of the Corporation and a Secondary Reserve to which shall be credited the amounts of the prepayments made by insured institutions pursuant to subsection (d) and the credits made pursuant to the first sentence of subsection (e)."

still is, 2% of the net increase in the total of the institution's insured accounts, less any amount the institution is required, by 12 U. S. C. § 1426 (c), as of the end of that year, to expend in purchasing stock in the Federal Home Loan Bank.[5] The additional premium is to be credited to the Secondary Reserve. Section 404 (a), 12 U. S. C. § 1727 (a).

As noted, FSLIC's statutorily prescribed Primary Reserve is its general reserve. It is credited annually with the Corporation's net income; this net thus represents retained earnings. The § 404 (b)(1) premium payments, that is, the $\frac{1}{12}$ of 1% required of each insured institution, constitute a major item in FSLIC's gross income. To the extent these premium payments exceed the corporation's expenses and insurance losses for the year, they flow as part of FSLIC's net to the Primary Reserve. The insured institutions have no property interest in the funds constituting the Primary Reserve.

The Secondary Reserve subsists separately and possesses different characteristics. It, of course, receives the 2% "additional premium," to the extent such is payable, required by § 404 (d) from each insured institution. FSLIC must also credit the Secondary Reserve annually with a "return" on the Secondary Reserve's "outstanding balances . . . at a rate equal to the average annual rate of return to the Corporation during the year . . . on the investments held by the Corporation in obligations of,

---

[5] The 1961 Act, by its § 2, repealed § 6 (l) of the Federal Home Loan Bank Act, 12 U. S. C. § 1426 (l), which had the effect of reducing from 2% to 1% the stock an insured institution is required to hold in relation to its outstanding unpaid loan principal. (The 2% requirement had been provided by the Act of June 27, 1950, § 2, 64 Stat. 257.) It was contemplated that for most institutions this reduction would approximately offset the additional payment to the Secondary Reserve required under § 404 (d). H. R. Rep. No. 823, 87th Cong., 1st Sess., 2 (1961); S. Rep. No. 778, 87th Cong., 1st Sess., 1–2 (1961).

or guaranteed as to principal and interest by, the United States." Sections 404 (a) and 404 (e), 12 U. S. C. §§ 1727 (a) and 1727 (e). In contrast with the Primary Reserve, the Secondary Reserve is "available . . . only for losses of the Corporation" and then "only to such extent as other accounts of the Corporation which are available therefor are insufficient for such losses." Section 404 (e), 12 U. S. C. § 1727 (e).

Each insured institution has a pro rata share in the Secondary Reserve. Section 404 (e) states that this is not assignable or transferable except as FSLIC, by regulation or otherwise, provides "in cases of merger or consolidation, transfer of bulk assets . . . and similar transactions . . . ." An insured institution may obtain a cash refund of its pro rata share if its status as an insured is terminated, § 407, 12 U. S. C. § 1730, or if a receiver or other legal custodian is appointed for purposes of liquidation, or if the Corporation determines that the institution has gone into liquidation. Section 404 (f), 12 U. S. C. § 1727 (f).

Following any December 31 on which the aggregate of the Primary Reserve and the Secondary Reserve equals or exceeds 2% of the total of all insured accounts plus creditor obligations of all the insured institutions (and the Primary Reserve alone does not equal or exceed such 2%), the additional premiums required by § 404 (d) are suspended. Section 404 (g), 12 U. S. C. § 1727 (g).[6] When this takes place, the pro rata share of each insured institution in the Secondary Reserve is used, to the extent available, to discharge the institution's obligation to pay its regular, or basic, premium required for that year under § 404 (b)(1). Thereafter, if the aggregate of the two

[6] The Act of Dec. 23, 1969, Pub. L. 91–151, § 6 (a), 83 Stat. 375, changed, effective after 1969, the applicable reserve and premium measures to the designated percentages of only "accounts" rather than accounts plus "creditor obligations."

reserves decreases to less than $1\frac{3}{4}\%$, the obligation to pay the additional premium under § 404 (d) resumes and the pro rata share in the Secondary Reserve is no longer used to pay the § 404 (b)(1) regular premium. Whenever, following any December 31, the Primary Reserve alone equals or exceeds such 2%, the Corporation shall pay in cash to each insured institution its pro rata share of the Secondary Reserve and shall not thereafter accept further § 404 (d) prepayments.[7]

FSLIC maintains a separate account for each insured institution's share of the Secondary Reserve. It submits to the institution annually a statement disclosing that share and the interest credited to it.[8] Under regulations issued by the California Savings and Loan Commissioner and by the Federal Home Loan Bank Board, Lincoln reports its interest in FSLIC's Secondary Reserve as an asset on its balance sheet and treats the interest earned on its pro rata share of the Secondary Reserve as income.[9]

---

[7] In 1961 FSLIC projected that the aggregate of the Primary and Secondary Reserves would equal or exceed 2% of all accounts and creditor obligations of all insured institutions by 1970; that no payments to the Secondary Reserve would be required for 1971–1975 and 1980–1995; that the Primary Reserve alone would reach the 2% level by 1995; and that the Secondary Reserve would be consumed by 1995 in discharging the insured institutions' premium obligations under § 404 (b) (1).

As a consequence of the 1969 amendments effected by Pub. L. 91–151, eliminating creditor obligations in measuring the adequacy of the reserves, the aggregate of FSLIC's Primary and Secondary Reserves reached the 2% suspension level in 1969 rather than 1970. Beginning in 1970 the Secondary Reserve is being used to fulfill the institutions' premium obligations under § 404 (b) (1).

[8] As of December 31, 1963, Lincoln's share amounted to $1,034,-689.86. As of December 31, 1967, it was $4,922,115.46. This had been accumulated since the § 404 (d) and (e) payments and credits began as required by the 1961 Act.

[9] The Internal Revenue Service has ruled that, for a cash basis taxpayer, this interest is not taxable in the year earned, but only

FSLIC annually sends Lincoln an "Insurance Premium Notice" for the basic premium due under § 404 (b)(1). It also sends Lincoln annually a "Notice of Insurance Premium Prepayment" for the amount, if any, due under § 404 (d). For 1963 the former was $135,760.52 and the latter was $882,636.86. Each was paid by Lincoln.

On its 1963 federal income tax return Lincoln deducted both its § 404 (b)(1) payment and its § 404 (d) payment as ordinary and necessary business expenses under § 162 (a) of the Code. The Commissioner allowed the former, but disallowed the latter.

The Tax Court held that the § 404 (d) payment was a nondeductible capital expenditure and was not an ordinary and necessary business expense, and that the payment was deductible only when used from the Secondary Reserve to pay § 404 (b)(1) premiums or to meet actual losses of FSLIC. As noted above, the Ninth Circuit reversed by a divided panel.

## II

To qualify as an allowable deduction under § 162 (a) of the 1954 Code, an item must (1) be "paid or incurred during the taxable year," (2) be for "carrying on any trade or business," (3) be an "expense," (4) be a "necessary" expense, and (5) be an "ordinary" expense. This Court has considered these several requirements, or one or more of them, in a number of cases. See, for example, *Welch* v. *Helvering,* 290 U. S. 111 (1933); *Helvering* v. *Winmill,* 305 U. S. 79 (1938); *Deputy* v. *du Pont,* 308 U. S. 488 (1940); *Interstate Transit Lines* v. *Commissioner,* 319 U. S. 590 (1943); *Commissioner* v. *Heininger,* 320 U. S. 467 (1943); *Commissioner* v. *Tellier,* 383 U. S.

when it is utilized from the Secondary Reserve to pay the institution's § 404 (b)(1) premium or when it is otherwise made available to the institution. Rev. Rul. 66–49, 1966–1 Cum. Bull. 36, 38.

687 (1966); *Woodward* v. *Commissioner,* 397 U. S. 572 (1970); *United States* v. *Hilton Hotels Corp.,* 397 U. S. 580 (1970).

In *Welch* Mr. Justice Cardozo emphasized the difference between the "ordinary" and the "necessary" and the need for satisfying both in order to achieve the deduction. It is in that case where his well-known, but elusive, suggestion for the answer appears:

> "The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." 290 U. S., at 115.

In *du Pont* MR. JUSTICE DOUGLAS stressed, 308 U. S., at 493, 495–496, the accepted rule of the "popular or received import" of a statute's words, and further emphasized that "[o]rdinary has the connotation of normal, usual, or customary," and that each case "turns on its special facts." In *Tellier* MR. JUSTICE STEWART also emphasized the double requirement of "ordinary" and "necessary" and said:

> "Our decisions have consistently construed the term 'necessary' as imposing only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business'. . . . The principal function of the term 'ordinary' in § 162 (a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." 383 U. S., at 689–690.

So much for generalities. Here clearly, as to its § 404 (d) "additional premium" payment in 1963, Lincoln satisfied three of the five listed requirements. The pay-

ment was made during the taxable year. It was made in carrying on a trade or business. And it was a "necessary" payment, for it was compelled by the provisions of the National Housing Act. The Government so concedes. The focus, therefore, and our only concern here, is whether the payment was an expense and an ordinary one within the meaning of § 162 (a) of the Code.

Lincoln's argument essentially is that its § 404 (d) payment was really no different from its § 404 (b)(1) payment for both were premiums for insurance of its depositors' accounts and creditor obligations; that all similarly situated insured savings and loan associations (there were 4,419 on December 31, 1963) paid the § 404 (d) premium; and that the possibility of a future benefit from the expenditure does not serve to make it capital in nature as distinguished from an expense.

We feel that the very recital of the facts and of the structure and operation of FSLIC's reserves, in Part I of this opinion, itself provides an answer adverse to Lincoln's argument. It is not enough, in order that an expenditure qualify as an income tax deduction, that it merely be one paid by all similarly insured associations, or that it serves to fortify FSLIC's insurance purpose and operation. Further, the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year.

What is important and controlling, we feel, is that the § 404 (d) payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162 (a) in the absence of other factors not established here. We note the following:

A. The § 404 (d) payment to FSLIC, when made, is subject to positive and rigid continuing controls. The payment must flow into the Secondary Reserve. That reserve is primarily available only for stated and circumscribed purposes, namely, the payment of losses and then only to the extent all other assets of FSLIC are insufficient to cover those losses. The Secondary Reserve thus has complete seniority with respect to demands upon FSLIC. It is the asset last called upon.

B. The insured institution has a distinct and recognized property interest in the Secondary Reserve. This is revealed by: (1) The recognition, in § 404 (e), of transferability of the institution's pro rata share therein. This transferability is limited and restricted, to be sure, but it exists for approved situations of merger, consolidation, and the like. (2) The prospective refund, and in cash at that, of the institution's pro rata share upon termination of its insured status, or upon receivership or liquidation, or when the Primary Reserve alone reaches the suspension level. (3) The use of the institution's pro rata share to pay its basic premium under § 404 (b)(1) when the suspension level is reached by the aggregate of the Primary and Secondary Reserves. (4) FSLIC's maintenance of a separate account for each insured institution's share in the Secondary Reserve. (5) The statutorily required annual credit from FSLIC's earnings to the institution's share of the Secondary Reserve. The share thus is an income-producing entity and the income inures to the benefit of the insured institution.

C. Although compulsory accounting rules do not control tax consequences, *Old Colony R. Co.* v. *Commissioner,* 284 U. S. 552, 562 (1932), there is significance in the fact that all concerned here have recognized the presence and the significance of this property interest

in the Secondary Reserve. FSLIC submits annual statements to its insured institutions showing payments and credits to their respective shares. Lincoln, albeit by federal and state requirements, shows that interest as an asset on its balance sheet and the credit as income. And Lincoln's parent corporation, First Lincoln Financial Corporation, although not subject to such regulation, has done the same in its financial statements.

D. The nature of the adjustments effected by the 1961 Act is of some import. Due primarily to the rapid growth of insured institutions in the years preceding the passage of that Act, the ratio of FSLIC's reserves to potential liability had declined. S. Rep. No. 778, 87th Cong., 1st Sess., 2, 12; Hearing on H. R. 7108 and H. R. 7109 before Subcommittee No. 1 of the House Committee on Banking and Currency, 87th Cong., 1st Sess., 10. By the Act Congress reduced the requirement for Federal Home Loan Bank stock and at the same time channeled new funds to FSLIC's Secondary Reserve. The § 404 (d) payment and the reduction in the FHLB stock purchase requirement were effectuated together. Certainly the FHLB stock is an asset and its acquisition is capital in nature. The complementary § 404 (d) payment is directed to a fund. Each is a device designed to achieve a particular and common result, namely, the providing of protection to the insured institution and to its depositors by way, in the one case, of liquidity and availability of loan funds and, in the other, by way of segregated amounts available to offset possible losses. Each is more permanent than temporary. Each partakes more of the character of an asset than of an expense. And the two are made complementary by the very provisions of § 404 (d).

We do not regard as contrarily persuasive, or as imposing an expense characteristic on the § 404 (d) pay-

ments, six features emphasized by Lincoln or by the Court of Appeals:

A. The possibility that Lincoln's share of the Secondary Reserve would be consumed by FSLIC's losses and thus would never be refunded to Lincoln. The Tax Court pointed out, 51 T. C., at 97, that this hazard exists with any routine investment in a bank or an insurance company and yet its presence does not make that investment an expense rather than a capital undertaking.

B. The general unlikelihood, as a practical matter, of Lincoln's recovery of its pro rata share of the Secondary Reserve. It is suggested that liquidation will not take place because in this day corporate activity is assumed to be a continuing process and not limited in duration. It is further pointed out that termination of FSLIC insurance is a business impossibility for it would result in mass withdrawal of depositors' accounts and in institutional suicide. It may well be true that liquidation is unlikely and that termination of insurance would be an undesirable business decision. The same may usually be said, however, of a manufacturing corporation's investment in plant and equipment or in patents or in many other assets basic to its business and function.

C. The claimed identity of purpose of the § 404 (b) (1) and § 404 (d) payments, namely, the providing of insurance for depositors' accounts. The former, however, is only annual in phase and operation. It provides insurance for the year. When the year passes, the insurance ceases. The latter, however, provides a fund available for losses not only in the current year, but in the future. It is a fund capable under certain circumstances of finding its way back to the coffers of the insured institutions. The ultimate purpose of the two payments may have much in common, but the route and the life of each differ from those of the other.

D. The compulsory character of the payment imposed both by the governing statute and the economic facts of life. Lincoln concedes, however, "Compulsion, whether legal or economic, should have no bearing upon the question whether a payment is an expense or a capital expenditure." [10]

E. The annual accounting concept of the income tax. This factor is relevant when the year of deduction is in issue. It has less consequence in the determination of whether an item is or is not an ordinary expense. As to this, the mere maturing of liability is not enough.

F. The suggestion that the § 404 (d) payment is not included in the list of nondeductible capital expenditures specified by § 263 of the 1954 Code. It is clear from the very language of §§ 162 (a) and 263 that the two sections together are not all inclusive, and that § 263 does not provide a complete list of nondeductible expenditures. *Iowa Southern Utilities Co.* v. *Commissioner,* 333 F. 2d 382, 385 (CA8 1964), cert. denied, 379 U. S. 946; *General Bancshares Corp.* v. *Commissioner,* 326 F. 2d 712, 716 (CA8 1964), cert. denied, 379 U. S. 832. See *Helvering* v. *Winmill,* 305 U. S. 79 (1938); *Woodward* v. *Commissioner,* 397 U. S. 572 (1970); *United States* v. *Hilton Hotels Corp.,* 397 U. S. 580 (1970).

## III

Lincoln's pro rata share of the Secondary Reserve, of course, is not without its tax aspects. If its share is used to pay losses or if, when the suspension level is reached, it is devoted to the payment of Lincoln's § 404 (b)(1) premium, a deduction at that time for the amount so used would appear to be in order. Indeed, the Internal Revenue Service has so ruled. Rev. Rul. 66–49, 1966–1 Cum. Bull. 36, 37. Cf. Treas. Reg. on Income Tax § 1.162–13.

[10] Brief in Opposition 17.

We emphasize that just as compulsory accounting is not controlling taxwise, *Old Colony R. Co.* v. *Commissioner, supra,* so the statutory labels of "prepayment" and "additional premium" contained in § 404 (d) are not controlling. *Burnett* v. *Commissioner,* 356 F. 2d 755, 758 (CA5 1966), cert. denied, 385 U. S. 832. We also emphasize that the fact that a payment is imposed compulsorily upon a taxpayer does not in and of itself make that payment an ordinary and necessary expense within the meaning of § 162 (a) of the 1954 Code.

We therefore conclude that Lincoln's § 404 (d) payment made in 1963 is not deductible under § 162 (a). See *Wichita State Bank & Trust Co.* v. *Commissioner,* 69 F. 2d 595, 596 (CA5 1934), cert. denied, 293 U. S. 562.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE DOUGLAS, dissenting.

Respondent is a state-chartered savings and loan institution, whose deposits are insured by the Federal Savings and Loan Insurance Corporation (FSLIC). To obtain this coverage, respondent must pay two premiums. Under § 404 (b) of the National Housing Act, it pays an annual premium of $\frac{1}{12}$ of one percent of the total amount of its savings accounts and creditor obligations. Pursuant to § 404 (d), it must also pay an additional premium equal to two percent of any net increase in the total amount of its insured accounts.[1] The § 404 (b) premium is considered gross income of FSLIC, approximately 95% of which is transferred to its Primary Reserve to cover losses. These premiums must be paid by insured institutions until the Primary Reserve equals two percent of

---

[1] This amount may be reduced by an amount equal to any requirement for the purchase of stock in the Federal Home Loan Bank of which the insured is a member.

the total insured savings accounts and creditor obligations of all insured institutions. Thereafter, insured institutions need pay no premiums unless and until the Primary Reserve drops below two percent. The § 404 (d) premium is not considered gross income of FSLIC but is transferred to a Secondary Reserve, to be used to cover losses only if other accounts prove insufficient, a possibility considered extremely remote. A separate accounting is kept for each insured institution, showing the § 404 (d) premiums paid. Under § 404 (g), at any time that the aggregate of the Primary and Secondary Reserves reaches 2% of all insured accounts and creditor obligations, no § 404 (d) payments need be made, and funds from the Secondary Reserve may be used to make § 404 (b) premium payments, until the aggregate falls below 1¾%. When the Primary Reserve reaches 2%, FSLIC is to pay each insured institution its pro rata share of the Secondary Reserve in cash. By FSLIC's projections, no § 404 (d) premium payments will be required in the years 1971 to 1975 and after 1979. No § 404 (b) premiums will be required after 1995, as the Primary Reserve will reach 2%. The respondent argues that there will be no payments of pro rata shares at that time, as the calculations of FSLIC show that the Secondary Fund will be exhausted prior to 1995.[2]

On its federal tax return for 1963 respondent deducted both its § 404 (b) and § 404 (d) premium payments as ordinary and necessary business expenses. The Commissioner of Internal Revenue allowed the deduction of § 404 (b) premiums, but disallowed the latter, characterizing these payments as nondeductible capital investments in

---

[2] The Solicitor General argues that it is possible that some insured institutions might receive refunds from the Secondary Reserve, if their growth fits a certain pattern. This however only raises the possibility of such a return, without showing that such a possibility is more than remote.

FSLIC, to be deducted only when used to pay § 404 (b) premiums or when used to meet actual losses of FSLIC. The Tax Court affirmed this ruling. The Court of Appeals for the Ninth Circuit reversed the Tax Court, finding the § 404 (d) premiums to be a reasonable and necessary business expense, deductible in the year paid. I agree with the Court of Appeals and dissent from the decision here.

There is no claim that the § 404 (d) premiums are not necessary. The position of the United States is that these premiums are not "ordinary," but "in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." *Commissioner* v. *Tellier,* 383 U. S. 687, 689–690 (1966). The Commissioner relies on the principle that a cost which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year is a capital outlay. From this he argues that the determination of whether respondent's § 404 (d) premiums are capital expenditures or deductible business expenses depends on whether the payments will provide a benefit in future years.

Because the respondent will obtain a benefit in the future from these premiums, in the form of lower § 404 (b) premiums or by a full refund of its pro rata share on termination or liquidation, he argues, the Secondary Reserve is a capital asset. It is not used for losses, and will never be used except in the event of a national catastrophe. These premiums are not recurring, and will likely be paid only in 13 of the 34 years from 1962 to 1995. Accounting principles, the Commissioner claims, demand that these payments be deducted when they are used, either to pay § 404 (b) premiums or to pay losses. "Only in this manner will the costs of FSLIC insurance be matched against the revenues generated because such insurance is maintained."

The rule professed by the United States is, of course, sound. The error is in applying it to this case. Respondent has not established an asset for future benefit. It has merely paid the premiums necessary to obtain insurance. It is true that premiums paid in 1963 may result in a reduction in premiums in later years. But labeling this the creation of an asset proves too much, for it invalidates the deduction of § 404 (b) premiums as well.

The benefit to be obtained from the payment of § 404 (d) premiums, whether they be capital expenditures or deductible expenses, is not the reduction of future premiums but insurance coverage. The Government readily admits that the present level of § 404 (b) premiums is not needed to cover current foreseeable losses. Indeed, losses have never exceeded investment income. The high premium rate is for the purpose of establishing a Primary Reserve, to cover conceivably serious losses in the future. When the Primary Reserve reaches a level deemed sufficient, no premium payments will be required at all. If "the costs of FSLIC insurance [are to] be matched against the revenues generated because such insurance is maintained," a major portion of the § 404 (b) premiums should also be capitalized, to be depreciated over some appropriate term.

Nor is it controlling that the Secondary Reserve is a capital account insofar as FSLIC is concerned. As the Court of Appeals stated:

> "We think the emphasis upon the treatment of the receipt by the payee, FSLIC, is mistaken and that in determining whether an expense is an ordinary and necessary expense of doing business, the focus should be on the taxpayer and the taxpayer's business, not on what the payee does with the money paid. This is not to say that rights retained by the taxpayer are to be ignored." 422 F. 2d 90, 92.

A decision that § 404 (d) premiums are not deductible, while § 404 (b) premiums are, must rest on the only distinction between the two, the rights retained by respondent in the Secondary Reserve. These are evidenced by the keeping of separate "accounts," the payment of earnings to these accounts, and the possibility of a recovery of a pro rata share of the Reserve. But, as the Court of Appeals noted, respondent is a going concern, and the possibility of a return of its share on liquidation is not a proper consideration. As termination of insurance would surely lead to liquidation, this could not be considered either. The possibility that some part of the Secondary Reserve might be returned to respondent when the Primary Reserve reaches a sufficient level is, at best, remote. This contingent possibility of recovery does not render an otherwise deductible payment nondeductible. *Alleghany Corp.* v. *Commissioner,* 28 T. C. 298, 305; *Electric Tachometer Corp.* v. *Commissioner,* 37 T. C. 158, 161.

The returns paid on a pro rata share of the Secondary Reserve are paid out of earnings, that is, out of funds which would otherwise be transferred to the Primary Reserve. The payment does not increase the aggregate amount of the reserves. The returns paid are not available to the insured institution, and not taxable to it until paid for its benefit, according to the Internal Revenue Service. At that point, the insured institution would declare the income and deduct the amount as an expense. Therefore, absent the remote possibility that the insured institution might receive a pro rata share, it is immaterial whether returns are paid to the Secondary Reserve or only to the Primary Reserve. Also, the revenue ruling that the insured institution does not have even constructive possession of a pro rata share of the Secondary Reserve, for purposes of taxing returns

on that fund, is inconsistent with the position that the same pro rata share is a capital asset of the institution.

On these facts, the Court of Appeals was correct in determining that the § 404 (d) premiums, paid for the purpose of obtaining insurance necessary for the success of respondent's business, were deductible as an ordinary business expense.