T.C. Memo. 2004-45


UNITED STATES TAX COURT


CHIEF INDUSTRIES, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2007-00.                Filed March 2, 2004.


<u>Gerald P. Laughlin</u>, <u>Kent O. Littlejohn</u>, and <u>Frank J. Reida</u>,
for petitioner.

<u>William R. Davis, Jr.</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioner seeks redetermination of
deficiencies in Federal income tax for the taxable years ended
June 30, 1996 and 1997, of $619,501 and $431,062, respectively.
The issues relate solely to respondent's disallowance of a

claimed deduction for the taxable year ended June 30, 1996. The deficiencies arose in 2 taxable years because respondent's adjustment affected the amount of the general business credit carried forward and applied to the taxable year ended June 30, 1997.

After concessions by the parties, we are left to decide whether petitioner may deduct a $3,082,710 payment that it made to its former employee/shareholder Virgil R. Eihusen (V. Eihusen). Petitioner made the payment to V. Eihusen in relinquishment of its obligations under an employment agreement with him and in settlement of various legal claims which he had filed against petitioner. At the same time, petitioner also paid V. Eihusen other amounts in reacquisition of all of his stock in petitioner.

We hold that petitioner may deduct the $3,082,710 payment under section 162(a) as an ordinary and necessary business expense and that section 162(k) does not preclude this deduction. Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the subject years. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Many facts were stipulated, and we incorporate the parties' stipulation of facts and the accompanying exhibits by this

reference.  When the petition was filed, petitioner's principal place of business was in Nebraska.

1.  Background

Petitioner is a manufacturer that was established in 1954. Its principal founder, V. Eihusen, was closely involved with petitioner's business operations for several decades.  Under his leadership, petitioner grew from a small construction company with two employees into a large conglomerate which, during each of the subject years, had over $200 million in gross sales and over 1,200 employees.  Petitioner's growth was attributable, in part, to its addition of key employees and its strategic acquisitions.

In 1987, V. Eihusen voluntarily relinquished his position as petitioner's president to his son, Robert G. Eihusen (R. Eihusen).  V. Eihusen retained his positions as chairman of petitioner's board of directors (board) and its chief executive officer (CEO).  In these capacities, V. Eihusen continued to play a leading role on special projects, one of which was petitioner's 1990 acquisition of an ethanol plant in Hastings, Nebraska.

Because of its need for expansion of the ethanol facility, petitioner required additional financing.  After extensive negotiations with several financial institutions, petitioner entered into a $35 million loan agreement (loan agreement) with the Boatmen's National Bank of St. Louis (bank) on November 4,

1992. The loan agreement contained various covenants restricting petitioner's ability to alter its business practices without previous approval from the bank.

Also in 1992, in furtherance of his continuing efforts to explore investment opportunities for petitioner, V. Eihusen considered having petitioner pursue a joint venture equity investment in Russia (Russia project). Members of the board became concerned that pursuing the Russia project could cause petitioner to breach one or more of the covenants spelled out in the loan agreement.

2. Removal of V. Eihusen and Its Immediate Aftermath

On March 5, 1993, the board held a special meeting (meeting) at which it removed V. Eihusen as petitioner's chairman and CEO and elected R. Eihusen to these positions. At this time V. Eihusen remained one of petitioner's directors, shareholders, and employees. Also at the meeting, the board elected R. Eihusen, Linda M. Berney, Barbara J. Saladen, and David Schocke as the sole members of the administration committee (ESOP committee) of the Employee Stock Ownership Plan (ESOP) of Chief Industries, Inc. Petitioner had established the ESOP and the related trust in 1976 and had appointed First National Bank of Omaha (First National) to serve as trustee.

Commencing at the meeting and continuing afterward, V. Eihusen and the board engaged in a prolonged struggle over

managerial control of petitioner.  V. Eihusen was then the largest (but neither majority nor controlling) shareholder of petitioner by virtue of his direct ownership of 364,047 shares of common stock (4,219 of which were restricted shares) and his indirect ownership of 8,757.706 shares of common stock held through the ESOP.  The board did not want V. Eihusen to be able to dictate the course of action with respect to petitioner's management and business affairs.  V. Eihusen desired to regain managerial control of petitioner and to protect his lifetime investment therein.

On April 3, 1993, petitioner and V. Eihusen entered into an employment agreement (employment agreement).  The employment agreement provided that V. Eihusen could use the title "chairman of the board emeritus" but could not hold himself out as able to bind petitioner or to direct, hire, or fire any employee of petitioner.  Petitioner's obligations under the employment agreement included continuing to pay V. Eihusen an annual salary of $120,000, to provide him with health and dental benefits, and to reimburse him for vehicle and office expenses in specified monthly amounts.  The employment agreement did not have a definite term but could be terminated by petitioner upon breach of that agreement by V. Eihusen.

Following the meeting, V. Eihusen met with lawyers and discussed various courses of action relating to, among other

matters, his removal as petitioner's chairman and CEO. V. Eihusen on several occasions also communicated with First National representatives and objected to First National, in its role as the ESOP's trustee, voting the ESOP's shares in petitioner as directed by the ESOP committee because of what he believed was the ESOP committee's conflict of interest. First National continued receiving directives from the ESOP committee with respect to voting the ESOP's shares in petitioner. The voting maintained V. Eihusen's lack of control of petitioner's board and management.

3. ESOP Litigation

Because it was receiving conflicting directives from the ESOP committee and from V. Eihusen, First National on October 11, 1994, filed a lawsuit in the U.S. District Court for the District of Nebraska (ESOP litigation), under the caption "First National Bank of Omaha, as Trustee of the Chief Industries, Inc. Employee Stock Ownership Plan and Trust, Plaintiff vs. Chief Industries, Inc.; Robert G. Eihusen, Linda M. Berney, David Schocke, Barbara Saladen, as members of the Administration Committee of the Chief Industries, Inc. Employee Stock Ownership Plan; Virgil R. Eihusen, Individually; and Robert G. Eihusen, Individually, Defendants". First National essentially sought through this lawsuit a declaratory judgment that it might vote the shares in petitioner held by the ESOP in accordance with the specific

directives of the ESOP committee, and that such actions were a reasonable exercise of its discretion in its capacity as the ESOP's trustee. At that time, 32.27 percent of the outstanding shares in petitioner were held by the ESOP.

V. Eihusen counterclaimed in the ESOP litigation, alleging conflict of interest and self-dealing on the part of the ESOP committee. He sought a ruling that the ESOP's trustee was required to allow passthrough voting of the ESOP's shares in petitioner in accordance with the direction of the participants. In September 1995, the District Court ruled that petitioner could direct the ESOP's trustee on the voting of the ESOP's shares in petitioner. V. Eihusen's counterclaims were not included in this ruling, and they remained pending.

V. Eihusen had in his answer also cross-claimed against the ESOP committee, alleging a breach of fiduciary duty, conversion, and civil conspiracy. He sought through these cross-claims both equitable relief and compensatory damages. The District Court found these cross-claims to be preempted by Federal law and dismissed them on October 10, 1995.

4.  Intermodal Litigation

On or about May 15, 1995, petitioner and Mid-Am Intermodal Sales Co. (Mid-Am) entered into a plan of reorganization (Mid-Am purchase agreement). The Mid-Am purchase agreement was negotiated and executed without the knowledge of V. Eihusen, who

was still a member of the board at that time. Pursuant to the Mid-Am purchase agreement, petitioner acquired Mid-Am, and Mid-Am's sole shareholder, Thomas Hastings (Hastings), received, among other things, 58,366 shares of stock in petitioner, a put, and the entitlement to more shares as an earn-out. The consideration received by Hastings, a college friend of R. Eihusen, was unusually generous as compared with the consideration petitioner used in other acquisitions, and V. Eihusen believed that this transaction was undertaken for the purpose of diluting his ownership interest in petitioner.

V. Eihusen filed a third-party complaint in the ESOP litigation against members of the board, alleging that they committed a breach of fiduciary duty owed to him and to other shareholders of petitioner and that they engaged in civil conspiracy. Subsequently, he amended the third-party complaint to name petitioner and Hastings as defendants. V. Eihusen prayed in the third-party complaint for an injunction, the rescission of agreements among and between petitioner, Mid-Am, and Hastings, an award of attorney's fees and costs, and for the ordering of other types of relief. On October 30, 1995, the District Court dismissed the third-party complaint, as amended, for lack of subject matter jurisdiction.

Following this dismissal, V. Eihusen on November 14, 1995, filed a lawsuit in the District Court of Hall County, Nebraska

(Intermodal litigation), against petitioner, Thomas Hastings, individually, and R. Eihusen, Linda M. Berney, Melvin Auch, and Carolyn Loschen, as members of the board.  V. Eihusen alleged in this lawsuit that the named board members had breached a fiduciary duty, and he prayed for the cancellation and rescission of the Mid-Am purchase agreement and any stock issuance thereunder, or, alternatively, an order that petitioner issue additional shares to V. Eihusen to restore his voting rights and power to the same as it was before the acquisition of Mid-Am. Other forms of relief V. Eihusen prayed for were various injunctions, attorney's fees, and costs.

5.   Negotiations for Settlement

The board believed petitioner's position to be strong in both the ESOP litigation and the Intermodal litigation and vigorously denied any wrongdoing on the part of it and petitioner.  At the same time, the board appreciated the risks involved in litigation and was mindful of the substantial time and expense that petitioner needed to devote to this litigation.

In accordance with these considerations, petitioner and V. Eihusen considered a settlement proposal on November 1, 1995 (November 1995 proposal), under which V. Eihusen would withdraw his claims in the ESOP litigation and Intermodal litigation and surrender all of his stock in petitioner.  Petitioner, R. Eihusen, and V. Eihusen amended that proposal on March 1, 1996.

Under the amended proposal (March 1996 proposal), V. Eihusen would transfer all of his stock in petitioner, either owned directly or indirectly through the ESOP, to petitioner, R. Eihusen, or an entity controlled by R. Eihusen, and would withdraw any claim against petitioner, its directors, and its officers. V. Eihusen would also immediately place 30,000 of those shares in an escrow account and would agree to forfeit those shares to R. Eihusen if V. Eihusen breached any of the agreed-upon terms.

Petitioner, in turn, would under the March 1996 proposal agree to forgive a judgment (Hall County judgment) that it had received against V. Eihusen;[1] pay V. Eihusen $100 per share for 359,828 shares of stock in petitioner that he owned directly and 8,757.706 shares of stock in petitioner that he owned indirectly through the ESOP; pay V. Eihusen $86.09 per share for 4,219 restricted shares of stock in petitioner; convey to V. Eihusen a fee simple ownership, free of liens, of real property known as the Indian Head Golf Club, certain real estate adjacent to it, and all related personal property necessary to operate that business;[2] and indemnify V. Eihusen under certain circumstances,

_____

[1] This judgment arose from V. Eihusen's obligation with respect to a mid-1980s loan made by petitioner to a partnership, in which V. Eihusen was a partner. The judgment amounted to $1,386,951 including interest, as of June 28, 1996.

[2] The parties stipulated that the value of the Indian Head
(continued...)

which were significantly more limited in scope than those contained in the November 1995 proposal.

6.  <u>The Final Settlement and Share Repurchase</u>

As contemplated by the March 1996 proposal, petitioner and V. Eihusen entered into an "Agreement for the Purchase and Sale of Stock and Settlement of Claims" on April 19, 1996 (definitive agreement).  The definitive agreement replaced and superseded all of the previous agreements and set forth the entire understanding between the parties with respect to its subject matter.

The terms of the definitive agreement were generally similar to the terms of the March 1996 proposal.  One of the significant differences between the documents was the form of conveyance of the Indian Head Golf Club assets.  Instead of an outright transfer of the assets, petitioner and V. Eihusen engaged in an exchange of stock, with petitioner transferring to V. Eihusen all of the shares of Indian Head Golf Club, Inc., in exchange for 16,740 unrestricted shares of stock in petitioner, so as to purportedly qualify that exchange for tax-free treatment under section 355.  The definitive agreement also contained the obligation of petitioner and R. Eihusen to make a joint tender offer (tender offer) for all issued and outstanding shares of common stock in petitioner except for shares owned by V. Eihusen,

---

[2](...continued)
Golf Club and the related property was $1,673,735.

R. Eihusen, or members of the latter's immediate family. The tender offer was required to be set at a minimum of $100 per share.

After the execution of the definitive agreement but before its closing on June 28, 1996 (closing), V. Eihusen alleged that petitioner had defaulted on the definitive agreement with respect to a clause that obligated petitioner to continue operating the Indian Head Golf Club in the ordinary course of business. In settlement of this allegation, petitioner agreed to assume the lease obligations for certain golf carts, thereby incurring an additional cost of $21,759 (golf cart adjustment).

As contemplated by the definitive agreement, the parties thereto exchanged certain items at closing. Specifically, petitioner transferred to V. Eihusen $32,308,800 in redemption of 323,088 unrestricted shares of stock in petitioner owned directly by him; R. Eihusen transferred to V. Eihusen $2 million in exchange for 20,000 unrestricted shares of stock in petitioner owned directly by him; petitioner transferred to V. Eihusen $875,770 in redemption of 8,757.706 unrestricted shares of stock in petitioner owned indirectly by him through the ESOP; petitioner transferred to V. Eihusen all of the shares of Indian Head Golf Club, Inc., in redemption of 16,740 unrestricted shares of stock in petitioner owned directly by him; and petitioner transferred to V. Eihusen $363,214 in redemption of 4,219

restricted shares of stock in petitioner owned directly by him. Petitioner also transferred to V. Eihusen $1,674,000, forgave the Hall County judgment of $1,386,951, and factored in the golf cart adjustment of $21,759 in release of litigation and employment claims which V. Eihusen had, or may have had, primarily against petitioner and its directors, officers, and employees. V. Eihusen, in turn, delivered to petitioner in addition to the noted shares of stock: (1) Certificates evidencing dismissal, with prejudice, of all claims which he had outstanding against petitioner in both the ESOP litigation and the Intermodal litigation; (2) a global release of all claims he may have had against petitioner, its subsidiaries, First National, the ESOP committee, and petitioner's officers, directors, employees, and agents; (3) his resignation as a director, officer, and employee of petitioner; and (4) his release of petitioner's obligations under the employment agreement.

Petitioner deducted $3,082,710 ($1,674,000 + $1,386,951 + $21,759) as an ordinary and necessary business expense, noting on its tax return that this expense was a "lawsuit settlement cost". Respondent disallowed the deduction, determining that the payment in question was a nondeductible expense either because it was capital or because it was made in connection with petitioner's reacquisition of its stock.

OPINION

The Commissioner's determinations are presumed correct, and taxpayers bear the burden of proving them wrong. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). As one exception to this rule, section 7491(a) places upon the Commissioner the burden of proof with respect to any factual issue relating to liability for tax if the examination of the taxpayer's records for the subject year began after July 22, 1998, and the taxpayer maintained adequate records, satisfied the substantiation requirements, cooperated with the Commissioner, and introduced during the court proceeding credible evidence with respect to the factual issue. In that the record is sufficient for us to decide this case on its merits, and neither party alleges the applicability of section 7491(a) or of any other exception, we need not and do not decide the burden of proof issue.[3] D'Angelo v. Commissioner, T.C. Memo. 2003-295.

We decide first whether the disputed payment of $3,082,710 is otherwise deductible as an ordinary and necessary business

_____

[3] Respondent argues that petitioner has failed to establish that the $3,082,710 was not paid as consideration for the redeemed stock. We find to the contrary. Respondent does not question the fairness of the price paid for the stock in petitioner. Presuming without conceding that the price approximated the value of the stock in petitioner, we note that petitioner can pinpoint $3,082,710 as attributable to its settlement of the litigation and employment claims by subtracting from the total consideration paid under the definitive agreement the total consideration paid for the stock.

expense under section 162(a).  Given our conclusion that it is, we decide second whether its deduction is precluded by section 162(k), which applies to payments made "in connection with" the reacquisition of stock.

1.   Section 162(a)

Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  To qualify for a deduction under section 162(a), an item must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense.  Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971); Wells Fargo & Co. v. Commissioner, 224 F.3d 874 (8th Cir. 2000), affg. in part and revg. in part Norwest Corp. v. Commissioner, 112 T.C. 89 (1999); Lychuk v. Commissioner, 116 T.C. 374 (2001).

Respondent argues that petitioner may not deduct its payment of $3,082,710 to V. Eihusen under section 162(a) for many of the same reasons respondent advances in connection with section 162(k); namely, that the payment was made in connection with petitioner's reacquisition of its stock, or, in other words, in connection with an acquisition of a capital asset.  Respondent also argues for purposes of section 162(a) that the payment in question is a capital expenditure because the claims settled by

this payment originated with V. Eihusen's attempt to regain his former positions with petitioner. According to respondent, ensuring that this attempt is unsuccessful "can" increase the value of petitioner. Petitioner argues that the payment is deductible under section 162(a) in that the payment was made in part to defend against attacks on petitioner's business practices and, as to the rest, made in cancellation of an employment agreement. We agree with petitioner.

This Court has recently concluded that an expenditure must be capitalized when it (1) creates or enhances a separate and distinct asset, (2) produces a significant future benefit, or (3) is incurred "in connection with" the acquisition of a capital asset. Lychuk v. Commissioner, supra at 385-386. Respondent focuses his argument on the first and third prongs. Respondent does not assert, and thus we have no occasion to find, that any portion of petitioner's payment to V. Eihusen produced a significant long-term benefit to petitioner so as to require that this payment be capitalized under INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992). As to the third prong, i.e., an expense incurred in connection with the acquisition of a capital asset, we reject that argument for the reasons discussed infra as to section 162(k). As to the first prong, i.e., creation or enhancement of a separate and distinct asset, we conclude below that the test of Lincoln Sav. & Loan is satisfied with respect to

both the litigation settlement and the release of the employment agreement, and therefore reject that argument as well.

Pursuant to the definitive agreement, petitioner and R. Eihusen purchased all of V. Eihusen's stock in petitioner for $37,223,114. Contemporaneously with that purchase, but independent therefrom, petitioner also transferred to V. Eihusen a value of $3,082,710 in settlement of existing and potential disputes between the two of them and in relinquishment of V. Eihusen's rights under the employment agreement. More specifically, petitioner paid part of the $3,082,710 to V. Eihusen to settle all of the claims which he advanced against petitioner in the ESOP litigation and the Intermodal litigation, and to settle all other claims which he may have had against petitioner, First National, the ESOP committee, and petitioner's directors, officers, employees, and agents. Petitioner paid the rest of the $3,082,710 to V. Eihusen for his resignation as a director, officer, and employee of petitioner and for his release of petitioner from its obligations under the employment agreement.

As to the portion of the payment pertaining to the settlement of litigation, payments made to settle litigation are deductible as ordinary and necessary business expenses when they have business origin and otherwise satisfy the mandates of section 162(a). Anchor Coupling Co. v. United States, 427 F.2d

429 (7th Cir. 1970); <u>Eisler v. Commissioner</u>, 59 T.C. 634 (1973); <u>Old Town Corp. v. Commissioner</u>, 37 T.C. 845 (1962); <u>Oliver v. Commissioner</u>, T.C. Memo. 1997-84. A settlement payment has business origin when the transaction or activity causing the litigation originates in a trade or business; the potential consequences of a failure to prosecute or defend the litigation are secondary. See <u>Woodward v. Commissioner</u>, 397 U.S. 572, 577 (1970); <u>United States v. Gilmore</u>, 372 U.S. 39, 44-51 (1963); <u>Wells Fargo & Co. v. Commissioner</u>, <u>supra</u> at 887; <u>Anchor Coupling Co. v. United States</u>, <u>supra</u> at 433. The courts have created three independent tests which are helpful to determine whether a settlement payment with a business origin is deductible. These tests are (1) whether the taxpayer/payor lacked confidence that it would have prevailed in the lawsuit if it was not settled, (2) whether the taxpayer/payor made the payment to avoid damages or liability which might have resulted in the absence of the settlement, and (3) whether the belief held by the taxpayer/payor concerning the validity of the claim against him or her was justified to the extent that a reasonable person in his or her place would have thought that settlement was necessary. <u>Old Town Corp. v. Commissioner</u>, <u>supra</u> at 858-859. An answer in the affirmative to any of these tests tends to establish that the settlement payment is deductible under section 162(a).

Here, the claims underlying the settlement payment and alleging mismanagement by petitioner of its business, originated in petitioner's business decision to remove V. Eihusen as its chairman and CEO. In addition, in accordance with the three tests enunciated by the Court in Old Town Corp., we conclude that (1) members of the board lacked confidence that petitioner would prevail in the subject litigation; (2) petitioner made the settlement payment to avoid damages or liability it could have incurred absent the settlement; and (3) members of the board were justified in taking V. Eihusen's claims seriously and acted reasonably in attempting to settle the ESOP litigation and the Intermodal litigation so as to reduce the expenditure of time and the money. Also, applying the test of Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971), to the portion of petitioner's payment made to settle the ESOP litigation and the Intermodal litigation, we find that it (1) was paid or incurred during the subject years; (2) was incurred in connection with petitioner's trade or business as it was directly related to petitioner's business practices; (3) was an expense; (4) was a necessary expense in that petitioner was required to expend a significant amount of resources in defending itself and its directors, officers, and employees and hence settled the claims so as to avoid larger expenditures in continuing to litigate without any certainty of prevailing; and (5) was an ordinary

expense in that litigation, and the associated settlement costs, commonly arise in the course of conducting business.  In view of the foregoing, we conclude that the portion of the $3,082,710 relating to the settlement of litigation is deductible under section 162(a) as an ordinary and necessary business expense.

As to the portion of the payment made in discharge of petitioner's outstanding obligations under the employment agreement, that portion also qualifies for deductibility under section 162(a) to the extent it meets that section's requirements.  Peninsular Metal Prods. Corp. v. Commissioner, 37 T.C. 172 (1961); Driskill Hotel Co. v. Commissioner, a Memorandum Opinion of this Court dated May 22, 1953.  Applying the test of Commissioner v. Lincoln Sav. & Loan Association, supra, to the portion of petitioner's payment made to discharge its obligations under the employment agreement, we find that this portion (1) was paid or incurred during the subject years; (2) was incurred in connection with petitioner's trade or business as it was directly related to conducting petitioner's business; (3) was an expense; (4) was a necessary expense in that petitioner had an obligation to compensate V. Eihusen pursuant to the employment agreement; and (5) was an ordinary expense in that costs associated with maintaining or terminating an employment relationship commonly arise in the course of conducting business.  Thus, we hold that

petitioner is entitled to deduct the portion of its payment to V. Eihusen relating to the employment agreement.

In sum, we find petitioner's payment of $3,082,710 to V. Eihusen to be deductible under section 162(a) as an ordinary and necessary business expense. Because we conclude that the entire payment is deductible, we need not and do not apportion that payment between the litigation settlement and the employment agreement.

2.   Section 162(k)

Respondent argues that petitioner may not deduct the payment of $3,082,710 because it was made in connection with a reacquisition of stock under section 162(k)(1). We disagree with respondent.

Section 162(k)(1) disallows an "otherwise allowable" deduction for any amounts "paid or incurred by a corporation in connection with the reacquisition of its stock". By enacting this provision in 1986, Congress wished to provide expressly that all expenditures incurred in reacquisition by a corporation of its own stock are nonamortizable capital expenditures. In that the record establishes that petitioner's redemption of its shares owned by V. Eihusen was a "reacquisition" under section 162(k), our inquiry focuses on whether petitioner's payment of $3,082,710 to V. Eihusen occurred "in connection with" that reacquisition.

The phrase "in connection with" has been ascribed a broad meaning both with respect to section 162(k) and with respect to other statutory sections. See, e.g., Snow v. Commissioner, 416 U.S. 500, 502-503 (1974); Huntsman v. Commissioner, 905 F.2d 1182, 1184 (8th Cir. 1990), revg. and remanding 91 T.C. 917 (1988); Ft. Howard Corp. v. Commissioner, 103 T.C. 345 (1994), supplemented by 107 T.C. 187 (1996). An expense, however, does not fall within the broad meaning afforded it under section 162(k) simply because the expense is paid at a time that is proximate to a redemption. As the conferees made explicit in their report underlying the enactment of section 162(k):

> while the phrase "in connection with [a] redemption" is intended to be construed broadly, the provision is not intended to deny a deduction for otherwise deductible amounts paid in a transaction that has no nexus with the redemption other than being proximate in time or arising out of the same general circumstances. For example, if a corporation redeems a departing employee's stock and makes a payment to the employee in discharge of the corporation's obligations under an employment contract, the payment in discharge of the contractual obligation is not subject to disallowance under this provision. * * * Payments in discharge of other types of contractual obligations, in settlement of litigation, or pursuant to other actual or potential legal obligations or rights, may also be outside the intended scope of the provision to the extent it is clearly established that the payment does not represent consideration for the stock or expenses related to its acquisition, and is not a payment that is a fundamental part of a "standstill" or similar agreement. [H. Conf. Rept. 99-841 (Vol. II), at II-168 to II-169 (1986), 1986-3 C.B. (Vol. 4) 1, 168-169.]

The same conference report also explains that section 162(k) does not apply to a discharge of a corporate obligation even when an employment contract and a redemption agreement are contained in the same document and are negotiated at the same time. Id. at II-169 n.4, 1986-3 C.B. (Vol. 4) at 169.

The setting here is specifically referenced in the conference report, which places outside of section 162(k) both a payment in settlement of litigation and a payment in discharge of a corporation's obligation to a departing employee. Respondent attempts to downplay this portion of the report and in fact does not even discuss it, focusing instead on our opinion in Ft. Howard Corp. v. Commissioner, supra, and on the opinion of the Court of Appeals for the Eighth Circuit in Huntsman v. Commissioner, supra, for the proposition that the phrase "in connection with" is construed broadly to reach all costs connected in any way with a company's reacquisition of its stock. Respondent observes that V. Eihusen's lawsuits centered on his attempt to retain his lost positions and that these claims were settled at the same time as his stock was redeemed. Respondent draws from this proximity and the broad construction given to the phrase "in connection with" that the first event occurred "in connection with" the second event.

We agree with respondent that section 162(k) reaches broadly to deny deductibility of all expenses which are paid "in

connection with" a reacquisition of stock and does not simply encompass those amounts which were paid for the reacquired stock itself. We disagree with respondent, however, that the payment in question was made "in connection with" the reacquisition of stock within the meaning of section 162(k). In accordance with the quoted legislative history underlying section 162(k), payments, although arising out of the same general circumstances as a reacquisition and made proximate thereto, are not denied deductibility by section 162(k) when they lack any other nexus to the reacquisition. Such may be the case, the conference report clarifies, where, as here, a reacquisition payment is accompanied by a payment in settlement of claims as to litigation or employment.

In Ft. Howard, the taxpayer incurred expenses in obtaining funds necessary to effect a leveraged buyout (LBO). We concluded that these financing expenses, except for certain interest payments, were incurred "in connection with" the LBO because the LBO would not have been possible without the financing. We found that the financing costs were both a cause and an effect of the redemption. We noted that financing was "necessary" to the transaction as a whole and was an "integral part" of a detailed plan. Id. at 352-353. Here, by contrast, there was no similar relationship between petitioner's settlement of the litigation and employment claims, on the one hand, and its repurchase of

shares on the other hand.  In fact, the two transactions are not linked in any way except that they were executed and negotiated by the same parties and at the same time.

In <u>Huntsman</u>, the Court of Appeals for the Eighth Circuit construed the meaning of the phrase "in connection with" in the context of section 461(g)(2), which allows for the deduction of "points" paid on indebtedness incurred "in connection with" the purchase or improvement of a principal residence.  The court read the statute to require that the incurrence of indebtedness needs only to have an "association" or "relation" with the purchase of a residence to be connected with that purchase.  The court allowed the taxpayers to deduct points which they paid nearly 3 years after the acquisition of their residence to obtain financing used to satisfy their original 3-year balloon loan. <u>Id.</u> at 1183-1186.  In our case we find no "association" or "relation" between petitioner's repurchase of V. Eihusen's stock and the settlement of the referenced claims.

We have considered all arguments of the parties related to our holdings set forth herein and, to the extent not discussed, find those arguments to be irrelevant or without merit.

<u>Decision will be entered</u>

<u>for petitioner</u>.