T.C. Memo. 2004-177

UNITED STATES TAX COURT

MEDIAWORKS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1466-03.                    Filed July 28, 2004.

<u>Michael J. Schiff</u> and <u>Mark D. Pastor</u>,[1] for petitioner.

<u>Jonathan H. Sloat</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioner petitioned the Court to redetermine respondent's determinations as to its taxable years ended

---

[1] Mark D. Pastor (Pastor) represented petitioner in this proceeding from the time of the petition until Mar. 22, 2004, the date on which the Court granted Pastor's motion to withdraw from the case.  Michael J. Schiff entered his appearance in this proceeding on Apr. 1, 2004.

August 31, 1998 and 1999. Respondent determined that petitioner is liable for deficiencies of $65,772 and $53,459, respectively. Respondent determined that petitioner is liable for section 6662(a) accuracy-related penalties of $13,154.40 and $10,691.80, respectively.

Following the parties' concessions, we decide first whether petitioner may deduct expenses (disputed deductions) related to its yacht. We hold it may not. We decide second whether petitioner is liable for the accuracy-related penalties determined by respondent. We hold it is. Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT[2]

Some facts were stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Petitioner is a C corporation that was incorporated in 1991 under the laws of California. Its principal activity is the production of films,

---

[2] The Court directed each party to file an opening brief and a reply brief, the latter limited to making any objection to the opposing party's proposed findings of fact. Petitioner has not filed a reply brief. We conclude that petitioner has conceded respondent's proposed findings as correct, except to the extent that its opening brief contains proposed findings inconsistent therewith. Peacock v. Commissioner, T.C. Memo. 2002-122; Morgan v. Commissioner, T.C. Memo. 2000-231, affd. 23 Fed. Appx. 813 (9th Cir. 2001).

specifically, creative advertisements. Its principal place of business was in Studio City, California, when its petition was filed. For Federal income tax purposes, it uses the cash receipts and disbursements method of accounting and a taxable year that ends on August 31.

After 1996, William Michael Roach (Roach) was petitioner's sole shareholder, director, and officer. Roach is a lawyer by schooling and a filmmaker by profession. He is an avid and experienced sailor who during the subject years loved to race yachts. He was during those years a member of the California Yacht Club in Marina Del Rey, California (yacht club).

Throughout petitioner's existence, Roach has used petitioner and its resources to advance his personal enjoyment of sailing and his initiation into the sport of sailboat racing. On or about August 17, 1992, petitioner purchased a 30-foot Catalina sailboat (Catalina) for approximately $29,067. Petitioner's board resolved as to the Catalina that "It is in the best interest of the Corporation [petitioner] to purchase a Catalina 30 to be used for a general business office, staff and client meetings, and corporate entertainment for a purchase price of approximately $29,067". On September 18, 1996, petitioner purchased a 35.5-foot Beneteau sailboat (Beneteau) at a cost of $67,000. Petitioner's board resolved as to the Beneteau that "It is in the best interest of the Corporation to purchase a Beneteau

35.5 to be used for a general business office, staff and client meetings, and corporate entertainment for a purchase price of approximately $67,000".  On or about August 29, 1997, petitioner purchased the sailboat at issue, a 42-foot Centurion yacht (Centurion), for $155,000.[3]  Petitioner's board resolved as to the Centurion that "It is in the best interest of the Corporation to purchase a 1985 Centurion 42 by Wauquiez to be used for a general business office, staff and client meetings, and corporate entertainment for a purchase price of approximately $155,000".  At the time of the last resolution, petitioner was headquartered in two or three suites of offices in Burbank, California.  Those suites included at least one production studio and at least eight editing rooms.

Before petitioner purchased the Centurion, Roach had done little sailboat racing.  Roach considered the purchase of the Centurion to be an opportunity for him to compete in performance racing.  The Centurion is a very high class, powerful sailboat that was built in 1985 and is considered to be a prestigious and luxurious yacht that is one of the fastest yachts of great international class.  From an operation point of view, the Centurion was designed for pure sailing joy and has a helm that

---

[3] Petitioner disposed of the Catalina before purchasing the Centurion, and it sold the Beneteau 4 days after it purchased the Centurion.  In addition to these three boats, Roach, either personally or through petitioner, purchased three other sailboats.

challenges and entertains the most demanding helmsman.  From a structural point of view, the Centurion features, among other things, a double-berth stateroom, two or three cabins, two toilet compartments, a galley with a stove, oven, refrigerator, and handpainted tiles, and a spacious diningroom with a bar, a dining table, and comfortable seating around the dining table for at least eight individuals.  The Centurion also has on board a built-in compact disk player and speakers, a TV/VCR, and a video camera.

Roach moors the Centurion in a slip that petitioner rents at the yacht club, and he races the Centurion competitively.  In April 1998, Roach captained the Centurion in the 51st annual overnight race from Newport, California, to Ensenada, Mexico (Ensenada race).  Each individual in Roach's 6-man crew for the Ensenada race was an experienced and avid sailor, and none of these individuals was paid for his services on board the Centurion during the race.  Generally, at any given time during the Ensenada race, three or four of the individuals on board the Centurion actually sailed the Centurion while the others had no assigned duties and were free to sleep, read, fish, or do whatever else they wanted.  In February 1999, Roach captained the Centurion in the 15th biennial 8-day yacht race from Marina Del Ray, California, to Puerto Vallarta, Mexico (Puerto Vallarta race).  Roach listed himself in the Puerto Vallarta race as the

Centurion's owner, and each individual in Roach's 6-man crew for this race was an experienced and avid sailor who received no pay for his services on board the Centurion during the race. Before the Puerto Vallarta race, Roach and his crew trained for the race by taking the Centurion out on test runs. Roach and his crew slept on board the Centurion during both the Ensenada and Puerto Vallarta races, and they wined and dined together on board the Centurion (at least for lunch) during the Puerto Vallarta race. At least some of the individuals on board the Centurion also fished during the Puerto Vallarta race. Roach or one of his crew members, a fellow filmmaker, videotaped the events happening on board the Centurion during both races, and Roach queried whether he could someday include that segment for a commercial purpose.[4]

During each of the subject years, Roach also regularly raced the Centurion in the "Beer Can" races which the yacht club held weekly on the Wednesdays in and around the summer months. These races generally lasted approximately 1 hour and were held at sunset in the spirit of camaraderie and good-natured, friendly competition. Winners of the races received trophies as prizes, and the races were always followed by a dinner/party at the yacht

---

[4] In addition to the Ensenada and Puerto Vallarta races, which both lasted more than 1 day, Roach also planned to race the Centurion later in 1999 in a multiday race from San Francisco to Hawaii.

club that was held for and attended by Roach and the races' other participants.

Roach sailed in the beer can races with a total crew of 6 to 10 men and/or women, and none of these individuals was compensated for his or her services on board the Centurion during these races. Roach's crew members for the beer can races varied from week to week and consisted mainly of friends and whoever else happened to show up at the yacht club for the races. (One of Roach's regular crew members at these races was his personal insurance agent.) The commonality of all of Roach's crew members generally was that they enjoyed sailing. Roach considered the beer can races to be the perfect venue for entertaining clients and prospective clients, and, on some occasions, he invited clients or prospective clients of petitioner on board the Centurion during the beer can races to allow them to experience the joy of sailing. Roach sometimes videotaped the happenings on board the Centurion during the beer can races.

During the subject years, Roach also sailed the Centurion sometimes on weekends. During each of those years, individuals on board the Centurion took photographs, drank wine and beer, ate cheese, and discussed personal matters.

On its Federal income tax returns for the subject years, petitioner claimed the disputed deductions of $159,134 and $135,834, respectively, as to the Centurion. These underlying

expenses, none of which were identified on the returns as related to a boat, included depreciation, interest on a loan, slip expenses, and expenses for maintenance and repair. Respondent disallowed all of the disputed deductions determining that the Centurion was an entertainment facility and that the claimed expenses were nondeductible under sections 162 and 274. Neither petitioner nor Roach maintained a contemporaneous guest log (log) for the Centurion. During respondent's audit of the subject returns, Roach prepared a log for the Centurion, and he submitted that log to the Internal Revenue Service in support of his claim that petitioner used the Centurion entirely for business. The log identified individuals who were purportedly on board the Centurion during the subject years but who in fact were not. The log also did not reference the Ensenada or Puerto Vallarta races. During the discovery portion of this proceeding, Roach was evasive as to whether any individuals fished or slept on board the Centurion during the subject years.

Harold Jung (Jung) is a certified public accountant who for approximately 2 decades has been the accountant for Roach's many business companies and the preparer of Roach's individual income tax returns. Jung prepared petitioner's financial statements and Federal income tax returns for the subject years. Roach told Jung that Roach kept a log as to the Centurion and that petitioner used the Centurion 100 percent for business. Jung

prepared the subject returns relying upon that information. Roach did not tell Jung that, during the subject years, the Centurion sailed in the Ensenada, Puerto Vallarta, and beer can races, that individuals slept on the Centurion, and that individuals fished on board the Centurion; Jung believed otherwise as to each of these matters. Jung also was not told about the individuals who were on board the Centurion during the relevant years. Roach told Jung that the Centurion was used by petitioner as a conference/meeting room for its staff and as a place to write, and Roach led Jung to believe that Roach simply met individuals on board the Centurion while it was moored at the yacht club. Roach also led Jung to believe that meals were not eaten on board the Centurion.

Roach signed under penalties of perjury 1998 and 1999 property tax statements for the Centurion, and he submitted those statements to the Office of Assessor for the County of Los Angeles. Roach reported on the 1998 property tax statement that the Centurion's use was "recreation". Roach reported on the 1999 property tax statement that the Centurion's use was "pleasure".

OPINION

1. <u>Court's Perception of Petitioner's Witness Roach</u>

Petitioner's primary witness at trial was Roach. On the basis of our view of Roach when he testified, as well as on the basis of our consideration of his testimony in the light of the

record as a whole, we did not find Roach to be credible.  Under the circumstances, we are not required to, and we do not, rely on Roach's testimony to support petitioner's positions herein. <u>Ruark v. Commissioner</u>, 449 F.2d 311, 312 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48; <u>Clark v. Commissioner</u>, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. in part and remanding T.C. Memo. 1957-129; <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).

2.  <u>Disputed Deductions</u>

Section 162(a) allows the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Under that section, a cash basis taxpayer such as petitioner may deduct an expenditure if it is:  (1) An expense, (2) an ordinary expense, (3) a necessary expense, (4) paid during the taxable year, and (5) made to carry on a trade or business.  <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403 U.S. 345, 352-353 (1971); <u>Lychuk v. Commissioner</u>, 116 T.C. 374, 386 (2001).

Respondent determined that sections 162 and 274 do not entitle petitioner to deduct its expenses related to the Centurion.  In order to prevail, petitioner must prove that determination wrong.[5]  Rule 142(a)(1); <u>Welch v. Helvering</u>,

---

[5] Sec. 7491(a) was added to the Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, effective for court proceedings arising from examinations commencing after July 22, 1998.

(continued...)

290 U.S. 111, 115 (1933). Petitioner also bears the burden of proving its entitlement to any deduction claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934).

Petitioner argues that the evidence establishes that it used the Centurion entirely for business and that it did not use the Centurion at all for the purpose of entertainment, amusement, or recreation. Petitioner asserts that the Centurion was a business facility with offices on board and that it also used the Centurion to film sailboat races and experiment with a digital camera for the production of documentaries. We disagree with petitioner's assertions as to its use of the Centurion. On the basis of the record before us, we are convinced that petitioner's use of the Centurion had little, if any, relationship to its business but was primarily (if not solely) for the personal enjoyment, entertainment, amusement, and/or recreation of Roach, an avid sailor and racer of yachts.[6] We conclude that the

---

[5](...continued)
Sec. 7491(a)(1) provides that the burden of proof shifts to the Commissioner in specified circumstances. Petitioner makes no argument that sec. 7491(a)(1) applies to this case, and we conclude that it does not. See, e.g., sec. 7491(a)(2) (sec. 7491(a)(1) applies with respect to an issue only if the taxpayer meets certain requirements).

[6] While Roach testified that the Centurion was purchased to film documentaries on yacht racing, Roach's longtime accountant, Jung, made no mention of such a purpose during his testimony. Nor did the minutes of petitioner's board meetings make any

(continued...)

expenses related to the Centurion were not "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" of petitioner's within the meaning of section 162(a) and, accordingly, that none of petitioner's expenses related to the Centurion are deductible by it under section 162(a). Cirelli v. Commissioner, 82 T.C. 335, 349-350 (1984); Am. Props., Inc. v. Commissioner, 28 T.C. 1100 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958); see also Carter v. Commissioner, T.C. Memo. 1978-202, affd. 645 F.2d 784 (9th Cir. 1981).

Even if petitioner did meet the requirements of section 162(a) as to those expenses, it would still not prevail. Under section 274(a)(1)(B),[7] deductions which otherwise would be

---

[6](...continued)
mention of the filming of documentaries; the minutes stated that the Centurion was "to be used for a general business office, staff and client meetings, and corporate entertainment". (Emphasis added.) Petitioner's petition to this Court also makes no mention of the filming of documentaries; it alleges as to this issue that "Expenses incurred by Petitioner during income tax years ended August 31, 1998 and August 31, 1999 in connection with maintaining an office at its principal place of business on * * * [the Centurion] are fully deductible under Code Section 162(a) for each of said income tax years." Petitioner made this allegation pursuant to Rule 34(b)(4) and (5), which requires that every petition to this Court contain "Clear and concise assignments of each and every error which the petitioner alleges to have been committed by the Commissioner in the determination of the deficiency * * * [and] Clear and concise lettered statements of the facts on which the petitioner bases the assignments of error".

[7] Section 274(a)(1) provides in pertinent part:
(continued...)

allowable for expenses paid with respect to a "facility" are not allowed when the facility is used in connection with an activity which is of a type generally considered to constitute entertainment, amusement, or recreation. Catalano v. Commissioner, 240 F.3d 842, 845 (9th Cir. 2001), affg. T.C. Memo. 1998-447; Gordon v. Commissioner, T.C. Memo. 1992-449; Stan Frisbie, Inc. v. Commissioner, T.C. Memo. 1990-419. In this context, the term "facility" "'includes any item of real or personal property which is owned, rented, or used by a taxpayer in conjunction or connection with an entertainment activity'". Ireland v. Commissioner, 89 T.C. 978, 981 (1987) (quoting H. Conf. Rept. 95-1800, at 249 (1978), 1978-3 C.B. (Vol. 1) 521, 583); see also sec. 1.274-2(e)(2)(i), Income Tax Regs. The Centurion is a yacht which, in turn, is a "facility" within the

---

[7](...continued)
SEC. 274(a). Entertainment, Amusement, or Recreation.--

(1) In general.--No deduction otherwise allowable under this chapter shall be allowed for any item--

(A) Activity.--With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to * * * the active conduct of the taxpayer's trade or business, or

(B) Facility.--With respect to a facility used in connection with an activity referred to in subparagraph (A).

applicable meaning of that term.[8]  Catalano v. Commissioner,

supra at 845; Stan Frisbie, Inc. v. Commissioner, supra; sec.

1.274-2(e)(2)(i), Income Tax Regs.; see also H. Conf. Rept.

95-1800, supra at 249, 1978-3 C.B. (Vol. 1) at 583 (for purposes

of section 274(a)(1)(B), the term "facilities" "[includes]

yachts, hunting lodges, fishing camps, swimming pools, tennis

courts, and bowling alleys * * * [and] may include airplanes,

automobiles, hotel suites, apartments, and houses (such as beach

cottages and ski lodges) located in recreational areas").

The slightest use of a facility in connection with an

activity which is of a type generally considered to constitute

entertainment, amusement, or recreation operates under the text

of section 274(a)(1)(B) to disallow any deduction as to that

facility.  See Ireland v. Commissioner, supra at 983; Harrigan

Lumber Co. v. Commissioner, 88 T.C. 1562, 1564-65 (1987), affd.

without published opinion 851 F.2d 362 (11th Cir. 1988); Catalano

v. Commissioner, T.C. Memo. 1998-447, affd. 240 F.3d 842 (9th

Cir. 2001); see also H. Conf. Rept. 95-1800, supra at 249, 1978-3

C.B. (Vol. 1) at 583.  Whether an activity is of such a type is

---

[8] Although Roach testified that in 1991 some associations
stopped calling a sailboat a "yacht" and that the Centurion is
therefore not actually a "yacht", we apply the meaning of that
term as it is commonly understood to include "any of various
recreational watercraft * * * [such as] a sailboat used for
racing".  Merriam-Webster's Collegiate Dictionary 1370 (10th ed.
1999).

measured objectively.  As the Treasury Department's regulations

under section 274 state as to the matter of entertainment:

> An objective test shall be used to determine whether an
> activity is of a type generally considered to
> constitute entertainment.  Thus, if an activity is
> generally considered to be entertainment, it will
> constitute entertainment for purposes of this section
> and section 274(a) regardless of whether the
> expenditure can also be described otherwise, and even
> though the expenditure relates to the taxpayer alone.
> This objective test precludes arguments such as that
> "entertainment" means only entertainment of others or
> that an expenditure for entertainment should be
> characterized as an expenditure for advertising or
> public relations.  * * *  [Sec. 1.274-2(b)(1)(ii),
> Income Tax Regs.]

We see no reason why this same sort of objective test should not

also apply to the other two matters of amusement and recreation.

Here, the Centurion was used by Roach, in the name of

petitioner, in connection with an activity, sailing, which is of

a type that we would consider to constitute entertainment,

amusement, and/or recreation.  In addition to the fact that

petitioner's board acknowledged in its minutes that sailing was a

form of corporate entertainment and that Roach admitted in the

property tax statements that sailing the Centurion was a form of

"recreation" and "pleasure", the builders of the Centurion

designed it specifically with an eye towards high class

entertainment, amusement, and recreation.  Roach also actually

used the Centurion for entertainment, amusement, and/or

recreation.  Roach raced the Centurion, slept upon it, wined and

dined upon it, and hosted upon it personal invitees who sometimes

relaxed, fished, took pictures, or conversed on matters of a personal nature. Roach also participated regularly in the beer can races, events which were held in the spirit of camaraderie and which, Roach stated, were the perfect venue for entertaining clients and prospective clients. The fact that the Centurion was used in connection with an activity of a type generally considered to constitute entertainment, amusement, and/or recreation is seen further from the testimony of Roach himself. He testified:

> Q  Mr. Roach, how long have you been sailing?
>
> A  Since approximately -- I think probably in 1975 was the first time I was ever on a sailboat.
>
> Q  So you enjoy sailing?
>
> A  Without a doubt.
>
> Q  What do you like about sailing?
>
>    \*     \*     \*     \*     \*     \*     \*
>
> A  I think really the bottom line reason I like sailing is simply because if I am on the water in the act of sailing -- not doing anything else, but sailing -- for me, whatever was bothering me back on shore drops away. I've ridden motorcycles for 30 years. It's the same experience. There are some things that I hope for each of us that gives us some release and sense of simply being in the moment and leaving the baggage, whatever it may be, of our daily lives behind for this particular moment.

We sustain respondent's disallowance of the disputed deductions.

3. Accuracy-Related Penalties

Respondent also determined that petitioner is liable for accuracy-related penalties under section 6662(a).  In relevant part, section 6662(a) and (b) imposes an accuracy-related penalty if any portion of an underpayment is attributable to negligence or disregard of rules or regulations.  Negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, any failure to exercise ordinary and reasonable care in the preparation of a tax return, and any failure to keep adequate books and records.  Sec. 1.6662-3(b)(1), Income Tax Regs.  Negligence has also been defined as a lack of due care or a failure to do what a reasonable and prudent person would do under similar circumstances.  Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989).  The term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  Sec. 1.6662-3(b)(2), Income Tax Regs.

Respondent bears the burden of production under section 7491(c) and must come forward with sufficient evidence indicating that it is appropriate to impose an accuracy-related penalty. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Once respondent has met this burden, the taxpayer must come forward with persuasive evidence that the accuracy-related penalty does not apply.  Id.  The taxpayer may establish, for example, that

part or all of the accuracy-related penalty is inapplicable because it is attributable to an understatement for which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). Whether a taxpayer acted as such is a factual determination, sec. 1.6664-4(b)(1), Income Tax Regs., for which the taxpayer's effort to assess the proper tax liability is a very important consideration.

Here, we conclude that respondent has met his burden of production. Petitioner's deductions of the expenses related to the Centurion were an unreasonable application of the internal revenue laws, e.g., the disputed deductions were contrary to the plain text of section 274(a)(1)(B) and to guidance as that text's interpretation that was published well before the first year in issue. See Catalano v. Commissioner, 240 F.3d at 845. Petitioner also failed to keep adequate books and records in support of those deductions, e.g., petitioner failed to maintain adequate records documenting the individuals who were on board the Centurion during the subject years. Petitioner, through Roach, also showed a lack of due care in the preparation of the subject returns, e.g., Roach did not give Jung all of the information required to report the disputed deductions correctly and gave to Jung misinformation as to those deductions.

Petitioner argues that it may escape the accuracy-related penalties in that, it claims, it relied reasonably upon Jung to

prepare its Federal income tax returns correctly. We disagree with petitioner's assertion that it relied reasonably upon Jung to prepare its tax returns correctly. While it is true that the reliance on the advice of a professional as to the tax treatment of an item may sometimes be enough to escape the imposition of a section 6662(a) accuracy-related penalty, see United States v. Boyle, 469 U.S. 241 (1985); sec. 1.6664-4(b), Income Tax Regs., the mere fact that a taxpayer such as petitioner claims to have relied upon a professional is not enough to fall within this defense. A taxpayer such as petitioner seeking to avail itself of this defense must prove by a preponderance of evidence: (1) The professional was a competent tax adviser who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also Catalano v. Commissioner, 240 F.3d at 845 (the reasonable reliance defense requires that the taxpayer establish the professional qualifications of a purported expert and the nature of the advice that was purportedly given).

On the basis of the credible evidence in the record, we are unable to conclude that any of these three requirements has been met. First, the mere fact that Jung is a certified public

accountant does not necessarily make him a competent tax adviser. While petitioner at trial focused his examination of Jung's qualifications on establishing that he is in fact a certified public accountant, petitioner made a feeble attempt to ferret out the professional qualifications of Jung as to tax matters. We do know from Jung's testimony, however, that he admittedly has an incomplete understanding of section 274 and its application to this case.

Second, the record establishes that petitioner did not give Jung all of the available information that he needed to report the disputed deductions correctly and that Roach actually gave Jung misinformation on the Centurion that affected his reporting of those deductions. As to the latter, Jung testified, his understanding of section 274(a)(1)(B) was that it applied only to boats that were out for long periods of time or that had people sleeping on board and that it did not apply to stationary boats which were simply used as a conference room or meeting place, such as he believed was the case as to petitioner's use of the Centurion.

Third, the record establishes that Roach, as an officer of petitioner, did not in good faith rely upon his stated belief that Jung would prepare the subject returns correctly. Roach, a lawyer, obviously knew that Jung would have needed, but did not have, all relevant available information on the Centurion in

order to prepare complete and accurate tax returns for petitioner and that Jung would be unable to prepare complete and accurate returns given the information with which he was furnished.

Nor do we believe that Roach, as an officer of petitioner, reasonably relied on his stated belief that a prior audit of the disputed deductions did not result in a disallowance of them. First, from a factual point of view, we are unable to find on the basis of the credible evidence in the record that respondent in a prior year actually passed upon the application of sections 162(a) and 274(a)(1)(B) to expenses similar to those underlying the disputed deductions. According to Jung, Roach's 1993 individual income tax return was the only prior return that was audited, and respondent determined during this audit that 20 percent of the sailboat use at issue there was personal in nature. We know nothing about the facts underlying that determination or the facts underlying the earlier boat (presumably, the Catalina). We do know, however, that the facts underlying the earlier boat's usage are different from the facts at hand in that Roach only began to race sailboats earnestly in 1993. We also know that petitioner has not explained why, in examining Roach's personal income tax return, respondent would have passed on an application of section 274(a)(1)(B). In a case such as this involving a corporation and its sole shareholder, that section serves to disallow the deduction taken for the

facility by the corporation as the owner.  Moreover, from a legal standpoint, even if respondent had passed upon the application of sections 162(a) and 274(a)(1)(B) to expenses similar to those at hand, the fact that respondent has previously examined a deducted expense in one year, and not disallowed it, does not mean that the expense is a proper deduction in another year.  Fleischli v. Commissioner, 123 T.C. ___, ___ (2004).  While the failure to disallow a prior deduction may in certain cases give a taxpayer reasonable cause for later claiming a similar deduction, such is not the case where, as here, the record fails to establish that the facts underlying the earlier deduction are similar to the facts underlying the later deduction.

We sustain respondent's determination as to the accuracy-related penalties.

---

All of the parties' arguments have been considered, and those arguments not discussed herein have been found to be without merit.  To reflect concessions,

Decision will be entered

under Rule 155.