T.C. Memo. 2015-144

UNITED STATES TAX COURT

LARRY W. KLINE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

LARRY W. KLINE AND CHRISTINE KLINE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27926-12, 27994-12.          Filed August 5, 2015.

<u>Derek W. Kaczmarek</u> and <u>David R. Jojola</u>, for petitioners.

<u>Alicia E. Elliott</u>, for respondent.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined the following income tax deficiencies and accuracy-related penalties under section 6662(a)[1] for the 2007 and 2008 tax years (years at issue), as follows:

| Docket No. | Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|---|
| 27926-12 | 2007 | $34,602 | $6,630.20 |
| 27994-12 | 2008 | 34,429 | 6,089.20 |

The issues for our consideration are:  (1) whether losses from petitioners' boat charter activity are subject to the passive activity loss limitations of section 469; (2) whether petitioners are entitled to deduct travel and meals and entertainment expenses in excess of the amounts respondent allowed; and (3) whether petitioners are liable for accuracy-related penalties.

FINDINGS OF FACT

Petitioners resided in Arizona at the time their petitions were filed.  Larry Kline filed a 2007 income tax return claiming single status.  Petitioners married on April 20, 2008, and filed a joint 2008 income tax return.

---

[1]Section references are to the Internal Revenue Code in effect for the years at issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*3]** Mr. Kline enlisted in the U.S. Navy during high school and went on to attend the Merchant Marine Academy (Academy). He spent one of his four years at the Academy at sea in Vietnam. Mr. Kline graduated from the Academy first in his class in 1971. He remained in the military reserves and obtained a position with Trans World Airlines and became a professional pilot in 1974. During the years at issue Mr. Kline was a captain at Southwest Airlines (Southwest) with more than 25 years of seniority.

Though Mr. Kline's profession had him logging hours in the sky, he never lost interest in spending time on the water. He enjoyed sailing in the British Virgin Islands (BVI), and, beginning around 2000, he skippered boats in the BVI Airline Regatta every October. Because he faced mandatory retirement from Southwest at age 60, Mr. Kline's love of sailing motivated him to consider starting a business that chartered boats to supplement his income during retirement.

Mr. Kline believed that the BVI would be an ideal location for a charter boat business. The BVI provide a relaxed cruising environment because navigation there is less challenging with an island usually in view. Mr. Kline settled on a business that would focus on chartering catamarans, set up a limited liability company, and eventually selected the name "Caribbean Sailing Cats".

**[*4]**   The Lagoon 440, a 44-foot-long catamaran sailboat, caught Mr. Kline's eye at a boat show in 2005.  The boat has many features that Mr. Kline considered ideal for his business.  The bridge is above the main salon, allowing a charter's participants to have a 360-degree view.  It has four air-conditioned passenger cabins, each with its own toilet facility.  The Lagoon 440 also has a simple sail plan and can be comfortably sailed by three or more people.

In 2005 Mr. Kline entered into an agreement to purchase a 2006 Lagoon 440.  This boat was named Fly-Bye and it was owned by Caribbean Sailing Cats during the years at issue.  Caribbean Sailing Cats purchased a second Lagoon 440, named Fly-Away, during 2008.

Mr. Kline entered into a management agreement with Horizon Charters, Ltd. (Horizon), on March 7, 2006.  He selected Horizon to manage the boats because, unlike other management companies, Horizon allowed Mr. Kline to be more involved in and have more control over the boats and their activity.  Fly-Bye and Fly-Away operated under a similar management agreement with Horizon at all times during the years at issue.  Pursuant to the terms of the management agreement Horizon was responsible for marketing the boats, setting charter prices, booking charters, keeping records of all charters, collecting money due from customers, and cleaning and maintaining the boats.

[*5] The amount Mr. Kline received from each charter varied and was tied to its net charter revenue. The management agreement defines "net charter revenue" as gross charter revenue minus: (i) standard referral commissions to outside, independent agents, brokers or the owner; (ii) 20% commission to Horizon when the boats were booked through Horizon's marketing and advertising programs; (iii) certain standard discounts offered directly to customers; and (iv) special promotions instituted by Horizon because of market conditions. Horizon was paid a management fee equal to 20% of net charter revenue. Horizon also received a "turnaround fee" for each charter, which covered cleaning and preparing the boat and dinghy for the next charter; changing linens; technical checks of the boat's rigging, shipwright, electrical, plumbing, and mechanical systems; and briefing and debriefing customers. Mr. Kline would receive a commission equal to 15% of a charter's gross charter revenue if it was booked with Horizon for the first time as a result of his direct referral.

The management agreement allowed Mr. Kline to use each boat for two weeks between December 1 and April 30 and for two weeks between May 1 and November 30 each year. Mr. Kline's use of the boats was in accordance with a charter from Horizon, under Horizon's standard charter contract. Though he did not have to pay the standard charter rate to Horizon when he chartered his own

[*6] boats, Mr. Kline was responsible for the following charter fees: (i) a turnaround fee at the current rate; (ii) round-trip taxi fare from the airport to the base; (iii) provisions and beverages; (iv) any crew; and (v) cruising taxes, permits, and other related expenses resulting from his charter. Mr. Kline was also responsible for refilling the boat's fuel and water tanks before returning it to Horizon.

Fly-Bye had 27 term charters in 2007 and 28 in 2008. Fly-Away had up to 10 term charters in 2008. Most of these were bareboat charters, but arrangements could be made through Horizon for provisions and a skipper if necessary. Mr. Kline chartered Fly-Bye twice in 2007 and twice in 2008, accounting for two of the term charters in each of the years at issue. The parties have stipulated that the average period of customer use for each boat during each of the years at issue was seven days or less.

Mr. Kline was active in advertising his boats to generate bareboat or skippered charters and specifically targeted his marketing efforts towards pilots at Southwest and other airlines. His efforts paid off because each of the times that Mr. Kline chartered Fly-Bye during the years at issue, it was to skipper a charter for friends and acquaintances from Southwest and other airlines (Kline charters). In addition to petitioners three couples participated in each of the 2007 Kline

**[\*7]** charters, three couples participated in one of the 2008 Kline charters, and two couples participated in the other.

Generally, the expenses for each Kline charter were divided equally among the participants, and a 10% fee was added as a profit margin. The expenses included fuel, provisions, meals on shore, food purchased at the grocery store, car rentals, customs charges, and the turnaround fee. Mr. Kline used credit cards to pay many of these expenses. Following each Kline charter Mr. Kline would send an invoice to the participants for the amount owed.

Mr. Kline reported the income from the Kline charters along with the income from the other term charters on the Schedules C, Profit or Loss From Business, attached to the Forms 1040, U.S. Individual Income Tax Return, for the years at issue. Mr. Kline and petitioners claimed deductions of $6,945 and $12,367 for travel on the Schedules C for 2007 and 2008, respectively.[2] Mr. Kline reported a loss of $105,930 on his 2007 Schedule C, and petitioners reported a loss of $98,371 on their 2008 Schedule C.

During the audit examination respondent's agent asked petitioners to provide the number of hours they spent in connection with the charter activity.

---

[2]Though claimed on the Schedules C as "travel", the amounts consisted of business, travel, and meals and entertainment expenses.

[*8] While they did not maintain a contemporaneous log of the time spent, Mr. Kline did maintain copies of email communications with Horizon. Using this correspondence and records of the length and destination of the Kline charters, petitioners were able to develop a log of the time they spent.

The log reflects totals of 470 hours for 2007 and 732.5 hours for 2008. The hours reflected in these totals are based on the following three categories: (1) the boat business, which involves running the charter business, including communication with Horizon, working on administrative aspects, and related matters; (2) advertising, which includes promoting the charter business to the public; and (3) the Kline charters, including the preliminary planning and determining the participants' needs for each trip.

Of the 470 hours for 2007, 386.5 hours were spent by Mr. Kline in connection with the two Kline charters. Of the 732.5 hours for 2008, 365.5 hours were attributable to Mr. Kline, 271.5 of which were for time he spent in connection with the two Kline charters. The remaining 367 hours for 2008 are attributable to Mrs. Kline, 254 of which were for the time she spent on the Kline charters.

Before each Kline charter Mr. Kline would speak with the participants to determine the destination and the itinerary. The amount of time that Mr. Kline

[*9] spent preparing for each Kline charter depended on the destination. The April 2007 Kline charter was from the BVI to St. Barts and St. Martin. Mr. Kline spent approximately 30 hours preparing for this charter. His preparation included reviewing sailing guides which detail each harbor, the currents, and winds. He also studied weather patterns, arranged for dockage in each harbor, and planned the route to ensure that the boat would be in position for bridge openings. The August 2007 Kline charter was from the BVI to Culebra and Vieques, which are part of the Spanish Virgin Islands. Mr. Kline spent significantly more time preparing for this charter, approximately 60 hours. This charter required more preparation because the sailing guide for the region was outdated; additional research was required to gather the information typically found in the guide. Mr. Kline also had to research where to clear customs and how to secure potable water for the boat.

Mr. Kline spent between 30 and 60 hours preparing for the 2008 Kline charters. The May 2008 Kline charter was from the BVI to St. Martin and St. Croix. The August 2008 Kline charter was to Anegada, the farthest part of the BVI chain. The channel to Anegada is very narrow; and because it was poorly marked at the time, vessels could easily get off course and run aground.

[*10] For each day during a Kline charter Mr. Kline worked approximately 12 hours. His activities included: piloting the boat; cleaning the boat; studying weather, water, and sailing conditions; renting cars and arranging for food and tours in each port; and arranging for provisions, mooring, and refueling in each port.

Mrs. Kline is an experienced nutritionist support dietician who managed the clinical staff at a hospital, and during 2008 she worked as an area dietician and nutrition manager for a home health care company. Before each Kline charter Mrs. Kline canvassed the people who were going on the charter about their dietary preferences and inquired about any special dietary needs. One of petitioners' goals on the Kline charters was to promote a healthful lifestyle, including a healthful diet, and Mrs. Kline used her background to achieve this goal.

Mrs. Kline planned the menus for all of the food served on the Kline charters. When ordering the food for the Kline charter Mrs. Kline had the option of selecting between custom or split provisioning. Custom provisioning requires selecting each item of food, and split provisioning is a choice between two or three preselected packages of food. In order to promote the goal of a healthful diet and to reduce waste and lower costs, Mrs. Kline arranged for custom provisioning for both of the 2008 Kline charters. Mrs. Kline spent about 30 hours before each

[*11] Kline charter in 2008 interviewing participants and arranging for custom provisioning.

Mrs. Kline, like Mr. Kline, spent about 12 hours each day working on the Kline charters. Mrs. Kline was responsible for preparing meals and snacks, cleaning up after meals, and purchasing any additional needed food at local stores. In addition to these responsibilities, she helped with lowering the sails and with mooring and steering the boat.

Mr. Kline received monthly billing statements for the years at issue from Horizon reflecting time spent by its employees in connection with Fly-Bye and Fly-Away. The statements reflected that individually Horizon's employees spent less time in connection with the boats than petitioners did during the years at issue.

Henry Leonning, director of operations, supervised Horizon's employees who maintained Fly-Bye and Fly-Away. It was Horizon's policy not to have a particular employee responsible for a particular boat. Mr. Leonning was not aware of any Horizon employee who worked as much as 100 hours on any of the boats managed by Horizon during any year. Using actual records of the number of times each boat was chartered, Mr. Leonning was able to extrapolate the number of hours spent on each boat by a particular employee.

[*12] Of all Horizon's employees, the exterior and interior boat cleaners spent the most time on petitioners' boats. During 2007 Fly-Bye was involved in 27 term charters, including the 2 Kline charters. Fly-Bye required 4 hours of interior cleaning and 4 hours of exterior cleaning before each term charter, for a total of 108 hours of interior cleaning and 108 hours of exterior cleaning during 2007. Horizon's exterior cleaning department had three employees, meaning that each employee spent an average of 36 hours on Fly-Bye. Similarly, Horizon's interior cleaning department had three employees, so each of these employees also spent an average of 36 hours on Fly-Bye during 2007.

Fly-Bye was chartered 28 times, including the two Kline charters, during 2008. The size of Horizon's interior cleaning and exterior cleaning departments remained the same in 2008. Consequently, each employee in each of these departments spent an average of 37.3 hours on Fly-Bye during 2008.

Other Horizon employees spent less time in connection with Fly-Bye and Fly-Away than those in the interior and exterior cleaning departments did during the years at issue. For example, a technician spent about three hours preparing a boat like Fly-Bye for a charter. Horizon had four technicians in 2007 and 2008. Accordingly, each technician spent an average of 20.25 hours during 2007 and 21 hours during 2008 on Fly-Bye. During the years at issue Horizon's reservations

[*13] department had two full-time employees and one part-time employee. It took an average of three hours for Horizon employees to book a charter. If the Kline charters are included, each full-time Horizon employee spent an average of 32.4 hours in 2007 and 33.6 hours in 2008 booking Fly-Bye's charters.

During audit examination respondent allowed $576 of the $6,945 claimed as travel expense deductions on the Schedule C for 2007 and $1,030 of the $12,367 claimed as travel expense deductions on the Schedule C for 2008. Deductions of $951 and $373 for supplies and $134 and $178 for other expenses were claimed on the Schedules C for 2007 and 2008, respectively. Respondent apparently did not question and allowed deductions for the amounts claimed for supplies and other expenses for the years at issue in full.

Petitioners introduced credit card statements, coupled with testimony, at trial in an attempt to support the travel expense deductions claimed on the Schedules C. The total amounts of expenses petitioners attempted to substantiate were $11,564.70 and $12,407.53 for 2007 and 2008, respectively. These amounts reflect all expenses claimed in connection with the charter business that were paid with credit cards, including the amounts respondent specifically allowed for travel, supplies, and other expenses and the amounts claimed by petitioners but not questioned by respondent. Petitioners met the substantiation requirements for total

[*14] expenses of $4,749.41 and $4,466.04 for travel, supplies, equipment, and fees incurred directly in connection with the charter business for 2007 and 2008, respectively. Petitioners did not adequately substantiate the remaining expenses, which related to meals at restaurants and food for people on the boat to share during the Kline charters.

Mr. Kline's Federal income tax return for 2007 and petitioner's Federal income tax return for 2008 were prepared by Richard Boehm. Mr. Boehm holds a bachelor's degree in accounting with a concentration in finance and is a certified financial planner and a professional tax return preparer with approximately 20 years of experience. On average he prepares 200 income tax returns annually. At the time of trial Mr. Boehm had known Mr. Kline for nearly 20 years and had prepared his returns beginning with the 1994 return. He also provided professional and business planning advice regarding the charter business. In connection with the preparation of the returns for the years at issue and in particular with respect to the charter business Schedules C, Mr. Boehm requested, and Mr. Kline provided, documentation to support the income and expenses that were reported on the returns.

**[\*15]**                                    OPINION

I.  Passive Loss

Section 469 generally prohibits using a loss from a passive activity to reduce income from nonpassive activities during any taxable year.  Sec. 469(a), (d)(1).  A passive activity is a business in which the taxpayer does not materially participate, and, unless an exception applies, includes any rental activity.  Sec. 469(c)(1), (3).  An activity involving the use of tangible property is not a rental activity if the average period of customer use for the property is seven days or less.  Sec. 1.469-1T(e)(3)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).  The parties have stipulated that the average period of customer use of petitioners' boats was seven days or less.

Whether petitioners' charter activities constitute a business is not an issue before the Court, as respondent concedes that petitioners were engaged in a business during the years at issue.  Respondent argues that petitioners did not materially participate in the charter business, and as a result, that they may not deduct losses from the business against nonpassive income for the years at issue.  Accordingly, the primary issue for our consideration is whether petitioners materially participated in the charter business.

[*16] Respondent, for the first time on brief, attempts to argue that petitioners' charter business should be split into two separate activities -- the Kline charters and the other term charters -- for purposes of determining material participation. A party may rely on a theory only if the opposing party is given fair warning so that it is not prejudiced in its ability to prepare its case. Smalley v. Commissioner, 116 T.C. 450, 455 (2001). The amount of surprise and the additional evidence that will be needed in connection with the new position are of key importance when determining whether prejudice exists. Pagel, Inc. v. Commissioner, 91 T.C. 200, 212 (1988), aff'd, 905 F.2d 1190 (8th Cir. 1990). Despite having the opportunity, respondent failed to raise this theory in the notices of deficiency, in his answer, in his pretrial memorandum, or at trial. Further, when the theory was raised on brief, it was undeveloped and unsupported by points and authorities. Accordingly, we will not consider respondent's theory that petitioners' charter business constituted two separate activities at this point because it would be prejudicial to petitioners.

A taxpayer materially participates in an activity if he or she is involved in its operations on a regular, continuous, and substantial basis. Sec. 469(h)(1). A taxpayer can establish material participation by satisfying any of seven tests provided in the regulations. Sec. 1.469-5T(a), Temporary Income Tax Regs., 53

**[*17]** Fed. Reg. 5725 (Feb. 25, 1988). Petitioners' sole contention is that they materially participated in the charter business because they satisfy the test in section 1.469-5T(a)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). This regulation provides that for purposes of section 469:

> [A]n individual shall be treated  * * * as materially participating in an activity for the taxable year if and only if--
>
>    *      *      *      *      *      *      *
>
> The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year * * *. [Id.]

For purposes of this test, if a taxpayer's spouse participates in the activity it will be treated as participation by the taxpayer. Id. para. (f)(3), 53 Fed. Reg. 5727.

"Work done by an individual in the individual's capacity as an investor in an activity shall not be treated as participation in the activity for purposes of * * * [the test] unless the individual is directly involved in the day-to-day management or operations of the activity." Id. subpara. (2)(ii). The temporary regulations provide examples of investor activity, including: reviewing financial statements or reports on operations of the activity, preparing analyses of the finances or

[*18] operations of the activity for the individual's own use, and monitoring the finances or operations of the activity in a nonmanagerial capacity.

Petitioners must show[3] that they spent 100 hours or more during 2007 and 2008 engaged in the charter business and that their participation was greater than that of any other person connected with the activity during the years at issue. The pertinent requirements for showing the hours and participation are as follows:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries. [Id. para. (f)(4).]

Though the regulations are somewhat ambiguous as to what records are required, we have consistently held that postevent "ballpark guesstimates" are not allowed. Moss v. Commissioner, 135 T.C. 365, 369 (2010); Goshorn v. Commissioner, T.C. Memo. 1993-578.

---

[3]There is no dispute about the burden of proof or the burden of going forward with evidence in these cases. Generally, taxpayers bear the burden of showing their entitlement to deductions and/or that the Commissioner's determination with respect to them is in error. Rule 142(a).

**[*19]** Petitioners contend that the number of hours spent for each year is far in excess of 100 hours and that the first prong of the test for material participation is satisfied. See sec. 1.469-5T(a)(3), Temporary Income Tax Regs., supra. Respondent's principal contention is that the Kline charters were personal and that time spent with respect to them should not count towards meeting the material participation test. This is a critical distinction for 2007 because Mr. Kline spent less than 100 hours on the charter business if the time he spent on the Kline charters is not counted. Further, some of the activities other than those connected with the Kline charters could be considered investor activity. Accordingly, the primary issue before the Court hinges on whether the time petitioners spent before and during the Kline charters may be counted towards the hours needed to qualify under the material participation test set forth in section 1.469-5T(a)(3), Temporary Income Tax Regs., supra.

Mr. Kline continued to work as an airline pilot during the years at issue, and he focused his marketing efforts on other pilots. The fact that Mr. Kline's friends and acquaintances were the Kline charter participants does not, per se, make those charters personal vacations or preclude them from being counted for purposes of the material participation test. While petitioners may not have owed the customary charter fee to Horizon in connection with the Kline charters, they

[*20] engaged in these charters for a profit. Petitioners divided the expenses for the Kline charters among the participants and added a 10% profit margin, and the income from these charters was included on the Schedules C for the years at issue. Respondent argues that there was no evidence, other than Mr. Kline's testimony, to the effect that there was income from the Kline charters. The focus of the trial and evidence submitted was not on the income side of the activity but on whether the losses (most of which respondent did not question) were passive losses that could not be used to reduce ordinary income. Mr. Kline credibly testified that the income from the Kline charters was included in the Schedule C income from the charter activity. There is nothing in the record that contradicts this testimony.

The time petitioners spent preparing for and sailing on the Kline charters may be considered for purposes of determining whether Mr. Kline materially participated in the charter business. The purpose of the material participation test is to distinguish actively participating in the operation of a business from investor-type activity. The fact that Mr. Kline skippered the four Kline charters and/or that the charter participants were his friends and acquaintances might be of some importance if this was a not-for-profit or section 183 case, but respondent has conceded that petitioners were engaged in a business and that is not the question for our consideration.

[*21] At the time of the audit examination petitioners developed a log of the hours that they spent in connection with the charter business. Petitioners calculated the amount of time spent on the charter activity by reviewing email correspondence with Horizon. They also reviewed the dates and locations of the Kline charters in order to reconstruct the amount of time that was spent working on, and preparing for, the Kline charters. Petitioners provided credible testimony explaining in some detail the tasks they performed in connection with the Kline charters. Though petitioners did not contemporaneously record their time, we find the time entries they provided to be reasonable reconstructions of the hours that they spent in the charter business and consistent with the requirements of section 1.469-5T(f)(4), Temporary Income Tax Regs., supra. On the basis of the evidence provided, we find that Mr. Kline and/or petitioners participated in the charter business for more than 100 hours in 2007 and 2008.

Petitioners have satisfied the first prong of the test in section 1.469-5T(a)(3), Temporary Income Tax Regs., supra, of the regulations; now we must consider the second prong. To satisfy the second prong of the test, petitioners' participation in the charter business must be more than that of any other "individual" that was involved in the activity for each of the years at issue. Respondent contends that petitioners were not directly involved in the charter

[*22] business and, therefore, Horizon employees must have spent more time in connection with Fly-Bye and Fly-Away than petitioners. However, on the basis of the invoices Horizon sent to petitioners regarding work done on the boats and the testimony of Horizon's operations manager during the years at issue, we conclude petitioners spent more time in connection with the boats than any individual employed by Horizon.

Mr. Leonning, Horizon's manager, testified that he was not aware of any employee who worked on any of the boats managed by Horizon spending as much as 100 hours. No single Horizon employee was specifically responsible for cleaning, maintaining, servicing, or booking Fly-Bye or Fly-Away.[4] The interior and exterior boat cleaners spent the largest amount of time involved with petitioners' boats. Each employee in the interior and the exterior cleaning departments spent an average of 36 hours on Fly-Bye in 2007 and 37.3 hours in

---

[4]There are cases where the participation of more than one individual other than the taxpayer was considered for purposes of the second prong of the test in sec. 1.469-5T(a)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). See, e.g., Goshorn v. Commissioner, T.C. Memo. 1993-578 ("[T]he Marina performed more management services than petitioner[.]"). The temporary regulation, however, clearly instructs that the taxpayer's participation is to be compared to the "participation in the activity of any other individual". Sec. 1.469-5T(a)(3), Temporary Income Tax Regs., supra. The parties presented evidence and arguments comparing petitioners' participation in the charter business to the participation of any other individual. The parties followed the specific letter and meaning of the regulation, and we see no reason to vary from that standard.

**[*23]** 2008. Thus, petitioners spent more time in connection with the boats than any other individual during each of the years at issue. We find that petitioners have satisfied the second prong of the test in section 1.469-5T(a)(3), Temporary Income Tax Regs., supra, and, therefore, are entitled to deduct their losses from their charter business against nonpassive income.

## II. Expenses

Next we consider whether petitioners are entitled to deduct expenses in excess of the amounts respondent allowed. On the Schedules C where the charter business was reported, Mr. Kline and petitioners claimed deductions of $6,945 and $12,367 for travel expenses for 2007 and 2008, respectively. Respondent allowed $576 and $1,030 of the claimed expenses deducted for 2007 and 2008, respectively, but determined that there was insufficient substantiation to allow deductions in excess of these amounts. The Court was not made aware of the specific travel expenses that respondent allowed. At trial petitioners used summaries with attached credit card statements, coupled with testimony, to substantiate expenses in excess of the amounts respondent allowed. Petitioners asserted that the evidence and testimony presented at trial substantiates $11,564.70 and $12,407.53 in expenses for 2007 and 2008, respectively.

**[\*24]** Section 162(a) provides that deductions are allowable for expenses paid or incurred in carrying on a trade or business. In order for an expense to be deductible, a taxpayer must show that the expenditures made were proximately related to the business and were ordinary and necessary. <u>Commissioner v. Lincoln Sav. & Loan Ass'n</u>, 403 U.S. 345, 352 (1971). Petitioners' records, coupled with testimony, meet the requirements of section 162 with respect to franchise fees, turnaround and incidental payments to Horizon, fuel expenses, and the cost of sailing charts and GPS devices.

Section 274(d) provides for more stringent substantiation requirements for certain types of business expenses, including travel, meals, and entertainment. In effect, a taxpayer's statement must be corroborated by evidence of the amount, time and place, purpose, and business relationship of the expenditure. Sec. 274(d)(4). Personal, living, or family expenses are not deductible. Sec. 262(a). With the exception of expenses incurred for meals at restaurants and food and provisions for individuals on the Kline charters to share, we find that petitioners' records, coupled with the testimony given at trial, satisfy the heightened substantiation requirements of section 274, and petitioners may deduct airfare to and from the Kline charters, U.S. Customs fees, and onsite car rentals.

**[\*25]** Our review shows that Mr. Kline and petitioners adequately substantiated expenses of $4,749.41 for 2007 and $4,466.04 for 2008. Accordingly, petitioners are entitled to additional allowances of $3,088.41 ($4,749.41 less $1,661 for the amounts respondent previously allowed or did not question for travel, supplies, and other expenses) and $2,885.04 ($4,466.04 less $1,581 for amounts respondent previously allowed or did not question for travel, supplies, and other expenses) for 2007 and 2008, respectively.

III. Accuracy-Related Penalties

Respondent also determined accuracy-related penalties under section 6662(a) on the underpayments for 2007 and 2008. Respondent determined that petitioners are liable for the penalties because they substantially understated their income tax within the meaning of section 6662(b)(2) and (d)(1) and/or the understatements were attributable to negligence or disregard of rules or regulations under subsection (b)(1). An "understatement" means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). In the case of an individual, an understatement is substantial if it exceeds the greater of 10% of the tax required to be shown on the income tax return or $5,000. Sec. 6662(d)(1)(A).

[*26] Respondent bears the burden of production with respect to petitioners' liability for the accuracy-related penalties determined in the notices of deficiency and must therefore produce evidence that it is appropriate to impose those penalties. See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001). As a result of our determination regarding the passive loss and expense issues, Mr. Kline's and petitioners' understatements of income tax for 2007 and 2008 will not exceed the greater of 10% of the tax required to be shown on the return or $5,000. Accordingly, respondent has not met his burden of production with respect to substantial understatements under section 6662(b)(2).

Although there is no substantial understatement for 2007 or 2008, respondent also determined that petitioners were negligent and disregarded rules and regulations. Section 6662(b)(1) provides for an accuracy-related penalty even where there is no substantial underpayment if a taxpayer was negligent or disregarded rules and regulations. Because we have decided that petitioners were not entitled to deduct all of the travel expenses claimed for the years at issue, we must decide whether petitioners were negligent in their reporting of those expenses.

"Negligence" is the failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard" is careless, reckless, or

[*27] intentional disregard.  Sec. 6662(c).  Negligence includes a taxpayer's

failure to maintain adequate books and records or to substantiate items properly.

Sec. 1.6662-3(b)(1), Income Tax Regs.  On the basis of our holding that

petitioners failed to maintain adequate records and to substantiate all claimed

travel expenses for 2007 and 2008, they fall within the definition for negligence.

The accuracy-related penalty is not imposed, however, with respect to any

portion of the underpayment of tax if the taxpayer can establish that he acted with

reasonable cause and in good faith with respect to that portion.  Sec. 6664(c)(1).

The burden is upon the taxpayer to prove reasonable cause.  See Higbee v.

Commissioner, 116 T.C. at 447-449.  We determine whether a taxpayer acted with

reasonable cause and in good faith by considering the pertinent facts and

circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners contend that their reliance on their tax professional, Mr. Boehm,

for the preparation of their 2007 and 2008 tax returns was reasonable.  In order for

a taxpayer to reasonably rely on the advice of a professional he must show:  "(1)

[t]he adviser was a competent professional who had sufficient expertise to justify

reliance, (2) the taxpayer provided necessary and accurate information to the

adviser, and (3) the taxpayer actually relied in good faith on the adviser's

judgment."  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99, aff'd,

[*28] 299 F.3d 221 (3d Cir. 2002). All facts and circumstances are taken into account when determining whether a taxpayer reasonably relied on the advice of a professional tax adviser. Sec. 1.6664-4(c)(1), Income Tax Regs.

Mr. Boehm was an experienced tax preparer who had been preparing Mr. Kline's returns since 1994, and he was integrally involved in the charter activity's business planning. Mr. Boehm testified that he requested and received documentation to support the items of income and deduction reported on the returns for the years at issue. Under the circumstances, we hold that it was reasonable for petitioners to rely in good faith on Mr. Boehm for the preparation of the returns for the years at issue. Therefore, petitioners are not liable for accuracy-related penalties for the years at issue.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.